# UNIVERSAL INTERPRETIVE SHUTTLE CORP. *v.* WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION ET AL.

No. 19. . Argued October 21–22, 1968.—Decided November 25, 1968.

*Jeffrey L. Nagin* argued the cause for petitioner. With him on the briefs were *Allen E. Susman* and *Ralph S. Cunningham, Jr.*

*Russell W. Cunningham* argued the cause and filed a brief for respondent Washington Metropolitan Area Transit Commission. *Manuel J. Davis* argued the cause for respondent D. C. Transit System, Inc. With him on the brief was *Samuel M. Langerman.*

*Assistant Attorney General Martz* argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Griswold, Francis X. Beytagh, Jr., S. Billingsley Hill,* and *Thomas L. McKevitt.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The Secretary of the Interior is responsible for maintaining our national parks, and for providing facilities and services for their public enjoyment through concessionaires or otherwise.[1] In meeting this responsibility, he has contracted for petitioner to conduct guided tours of the Mall, a grassy park located in the center of the City of Washington and studded with national monuments and museums. Visitors to the Mall may board petitioner's open "minibuses" which travel among the various points of interest at speeds under 10 miles per hour. Guides on the buses and at certain stationary locations describe the sights. Visitors may debark to tour the museums, boarding a later bus to return to the point of departure.

---

[1] 16 U. S. C. §§ 1, 17b, 20 (1964 ed. and Supp. III). This responsibility is met principally through the National Park Service, which was created by the Act of August 25, 1916, c. 408, § 1, 39 Stat. 535, as an agency of the Department of the Interior. Since there is no conflict between them, we shall refer directly to the Secretary of the Interior rather than to the Director of the National Park Service.

Suit was brought by the Washington Metropolitan Area Transit Commission (hereafter WMATC) to enjoin petitioner from conducting tours of the Mall without a certificate of convenience and necessity from the WMATC. Carriers permitted by WMATC to provide mass transit and sightseeing services in the City of Washington intervened as plaintiffs, and the United States appeared as *amicus curiae*. The concessionaire and the United States contend that the Secretary's authority over national park lands, and in particular his grant of "exclusive charge and control" over the Mall dating from 1898,[2] permit him to contract for this service without interference. The carriers and WMATC argue that the interstate compact which created the WMATC implicitly limited the Secretary's authority over the Mall, and gave rise to dual jurisdiction over these tours in the Secretary and the WMATC. One carrier, D. C. Transit System, Inc., also argues that its franchise limits the Secretary's power. In a detailed opinion the District Court dismissed the suit. The Court of Appeals reversed without opinion. We granted certiorari and, having heard the case and examined the web of statutes on which it turns, we reverse, finding the Secretary's exclusive authority to contract for services on the Mall undiminished by the compact creating WMATC or by the charter granted a private bus company.

---

[2] In the Act of July 1, 1898, c. 543, § 2, 30 Stat. 570, Congress placed the District of Columbia parks under the "exclusive charge and control" of the United States Army Chief of Engineers. This authority was transferred in the Act of February 26, 1925, c. 339, 43 Stat. 983, to the Director of Public Buildings and Public Parks of the National Capital. And in Executive Order No. 6166, June 10, 1933, H. R. Doc. No. 69, 73d Cong., 1st Sess., § 2, this authority finally devolved upon the agency now called the National Park Service. Act of March 2, 1934, c. 38, § 1, 48 Stat. 389.

## I.

That the Secretary has substantial power over the Mall is undisputed. The parties agree that he is free to enter into the contract in question. They also agree that he is free to exclude traffic from the Mall altogether, or selectively to exclude from the Mall any carrier licensed by the WMATC or following WMATC instructions. Moreover, the parties agree that the Secretary could operate the tour service himself without need to obtain permission from anyone.[3] Yet the WMATC argues that before the Secretary's power may be exercised through a concessionaire, the consent of the WMATC must be obtained.

This interpretation of the statutes involved would result in a dual regulatory jurisdiction overlapping on the most fundamental matters. The Secretary is empowered by statute to "contract for services . . . provided in the national parks . . . for the public . . . as may be required in the administration of the National Park Service . . . ." Act of May 26, 1930, c. 324, § 3, 46 Stat. 382, 16 U. S. C. § 17b. Moreover, he is "to encourage and enable private persons and corporations . . . to provide and operate facilities and services which he deems desirable . . . ." Pub. L. 89–249, § 2, 79 Stat. 969, 16 U. S. C. § 20a (1964 ed., Supp. III). Congress was well aware that the services provided by these national park concessionaires include transportation. Hearings on H. R. 5796, 5872, 5873, 5886, and 5887 before the Subcommittee on National Parks of the House Committee on Interior and Insular Affairs, 88th Cong., 2d Sess., 151–159 (1964). In this case the Sec-

---

[3] D. C. Transit System, Inc., an intervening carrier, contends otherwise. But that position is not directly at issue in our view of the case.

retary concluded that there was a public need for a motorized, guided tour of the grounds under his control, and that petitioner was most fit to provide it.

The WMATC, however, also asserts the power to decide whether this tour serves "public convenience and necessity," and the power to require the concessionaire to "conform to the . . . requirements of the Commission" and the "terms and conditions" which it may impose. Pub. L. 86–794, Tit. II, Art. XII, § 4 (b), 74 Stat. 1037. The Secretary's contract leaves the tour's route under his control, but the WMATC would in its certificate specify the "service to be rendered and the routes over which" the concessionaire might run within the Mall. Pub. L. 86–794, Tit. II, Art. XII, § 4 (d)(1), 74 Stat. 1037. Moreover, the WMATC might require the provision of additional service on or off the Mall and forbid the discontinuance of any existing service. Pub. L. 86–794, Tit. II, Art. XII, §§ 4 (e) and (i), 74 Stat. 1038, 1039. The contract with the Secretary provides fare schedules, pursuant to statutory authority in the Secretary to regulate the concessionaire's charges. Pub. L. 89–249, § 3, 79 Stat. 969, 16 U. S. C. § 20b (1964 ed., Supp. III). The WMATC would have the power to "suspend any fare, regulation, or practice" depending on the WMATC's views of the financial condition, efficiency, and effectiveness of the concessionaire and the reasonableness of the rate. Pub. L. 86–794, Tit. II, Art. XII, § 6, 74 Stat. 1040. And under the same section the WMATC could set whatever fare it found reasonable, although a profit of $6\frac{1}{2}\%$ or less could not be prohibited. The Secretary is given statutory authority to require the keeping of records by the concessionaire and to inspect those records, and the Comptroller General is required to examine the concessionaire's books every five years. Pub. L. 89–249, § 9, 79 Stat. 971, 16 U. S. C. § 20g

(1964 ed., Supp. III). The WMATC would also have the power to require reports and to prescribe and have access to the records to be kept. Pub. L. 86–794, Tit. II, Art. XII, § 10, 74 Stat. 1042. Finally, the Secretary is given by statute the general power to specify by contract the duties of a concessionaire, 16 U. S. C. §§ 17b, 20–20g (1964 ed. and Supp. III); the WMATC would claim this power by regulation and rule. Pub. L. 86–794, Tit. II, Art. XII, § 15, 74 Stat. 1045.

We cannot ascribe to Congress a purpose of subjecting the concessionaire to these two separate masters, who show at the outset their inability to agree by presence on the opposite sides of this lawsuit. There is no indication from statutory language or legislative history that Congress intended to divest the Secretary partly or wholly of his authority in establishing the WMATC. When the WMATC was formed there was in the statute books, as there is now, a provision that the "park system of the District of Columbia is placed under the exclusive charge and control of the Director of the National Park Service." Act of July 1, 1898, c. 543, § 2, 30 Stat. 570, as amended, D. C. Code § 8–108(1967). He was, and is, explicitly "authorized and empowered to make and enforce all regulations for the control of vehicles and traffic." Act of June 5, 1920, c. 235, § 1, 41 Stat. 898, D. C. Code § 8–109 (1967). And this extends to sidewalks and streets which "lie between and separate the said public grounds." Act of March 4, 1909, c. 299, § 1, 35 Stat. 994, D. C. Code § 8–144 (1967).[4] The creation

---

[4] The Secretary's power does not extend beyond these limits, however. In order to institute a transportation service from the Mall to a proposed Visitors' Center in Union Station he sought specific authorization from Congress to add to and confirm his existing authority and provide a service embracing both the Mall and its surroundings. S. Rep. No. 959, 90th Cong., 2d Sess., 8–10 (1968). Congress simply directed him to study the transportation

of the Public Utilities Commission—the predecessor of the WMATC—was not intended "to interfere with the exclusive charge and control . . . committed to" the predecessor of the National Park Service. Act of March 3, 1925, c. 443, § 16 (b), 43 Stat. 1126, as amended, D. C. Code § 40–613 (1967).

In this context the WMATC was established. After World War II, metropolitan Washington had expanded rapidly into Maryland and Virginia. The logistics of moving vast numbers of people on their daily round became increasingly complicated, and increasingly in need of coordinated supervision. Congress therefore gave its consent and approval through a joint resolution to an interstate compact which "centralizes to a great degree in a single agency . . . the regulatory powers of private transit now shared by four regulatory agencies." S. Rep. No. 1906, 86th Cong., 2d Sess., 2 (1960). These four agencies were "the public utility regulatory agencies of the States of Virginia, Maryland, and the District of Columbia and the Interstate Commerce Commission." Pub. L. 86–794, 74 Stat. 1031. The Secretary was not included in this listing. Moreover, Congress specifically provided that nothing in the Act or compact "shall affect the normal and ordinary police powers . . . of the Director of the National Park Service with respect to the regulation of vehicles, control of traffic and use of streets, highways, and other vehicular facilities . . . ." [5]

needs of the entire area. Pub. L. 90–264, Tit. I, § 104, 82 Stat. 44 (1968); S. Rep. No. 959, 90th Cong., 2d Sess., 3 (1968); H. R. Rep. No. 810, 90th Cong., 1st Sess., 5 (1967).

[5] Pub. L. 86–794, § 3, 74 Stat. 1050. The term "police power" is a vague one which "embraces an almost infinite variety of subjects." *Munn* v. *Illinois,* 94 U. S. 113, 145 (1877) (economic regulation of grain storage an aspect of police power). It is broad enough to embrace the full range of the Secretary's power over the Mall, which even prior to the compact was ordinarily directed to ends quite different from that of the surrounding municipalities in regulating their streets. The Secretary sought explicit recognition

Finally, the House Report on the compact lists the federal legislation which was suspended to give effect to the compact, and the laws giving exclusive control of the Mall to the Secretary are not on the list. H. R. Rep. No. 1621, 86th Cong., 2d Sess., 29–30 (1960).

There is thus no reason to ignore the principle that repeals by implication are not favored [6] or to suspect that the Congress, in creating the WMATC, disturbed the exclusivity of the Secretary's control over the Mall either by extinguishing entirely his power to contract for transportation services or by burdening the concessionaire with two separate agencies engaged in regulating precisely the same aspects of its conduct. Congress was endeavoring to simplify the regulation of transportation by creating the WMATC, not to thrust it further into a bureaucratic morass. It therefore established the WMATC to regulate the mass transit of commuters and workers. A system of minibuses, proceeding in a circular route around the Mall at less than 10 miles per hour, and stopping from time to time to describe the sights before disgorging most passengers where it picked them up, serves quite a different function.[7] The Mall is, and was intended to be,

---

of these differences through use of more specific language in the compact, but his clarification was not adopted. H. R. Rep. No. 1621, 86th Cong., 2d Sess., 20, 48–49 (1960).

[6] *E. g., Wood* v. *United States,* 16 Pet. 342, 363 (1842); *FTC* v. *A. P. W. Paper Co.,* 328 U. S. 193, 202 (1946).

[7] This transportation is undertaken by contract with the Federal Government to serve a purpose of the Federal Government, and so might be thought to fall within the specific exemption from the compact for transportation by the Federal Government. Pub. L. 86–794, Tit. II, Art. XII, § 1 (a)(2), 74 Stat. 1036. Moreover, it is not primarily designed to transport people "between any points" but rather back to the same point of departure, and might therefore be excepted from the WMATC's jurisdiction. Pub. L. 86–794, Tit. II, Art. XII, § 1 (a), 74 Stat. 1035. But we find it unnecessary to reach these arguments, which would involve much more severe limits on the power of the WMATC throughout the city.

an expansive, open sanctuary in the midst of a metropolis; a spot suitable for Americans to visit to examine the historical artifacts of their country and to reflect on monuments to the men and events of its history. The Secretary has long had exclusive control of the Mall and ample power to develop it for these purposes. We hold that the WMATC has not been empowered to impose its own regulatory requirements on the same subject matter.

## II.

If the WMATC is without jurisdiction to issue a certificate of convenience and necessity in this case, as we have found, then the D. C. Transit System's interpretation of its franchise as protecting it from any uncertified sightseeing service on the Mall would give it an absolute monopoly of service there: the WMATC, lacking jurisdiction over the Mall, would have no authority to certify another carrier. The Secretary, if D. C. Transit is right, would have to take D. C. Transit or no one. Nothing in the statute confers so rigid a monopoly.

Section 1 (a) of D. C. Transit's franchise, Pub. L. 757, c. 669, Tit. I, pt. 1, 70 Stat. 598, confers the power to operate a "mass transportation system." [8] That this does not include sightseeing is clearly shown by

---

[8] "There is hereby granted to D. C. Transit System, Inc. . . . a franchise to operate a mass transportation system of passengers for hire within the District of Columbia . . . the cities of Alexandria and Falls Church, and the counties of Arlington and Fairfax in the Commonwealth of Virginia and the counties of Montgomery and Prince Georges in the State of Maryland . . . *Provided,* That nothing in this section shall be construed to exempt the Corporation from any law or ordinance of the Commonwealth of Virginia or the State of Maryland or any political subdivision of such Commonwealth or State, or of any rule, regulation, or order issued under the authority of any such law or ordinance, or from applicable provisions of the Interstate Commerce Act and rules and regulations prescribed thereunder."

the separate grant of power to operate "charter or sight-seeing services" in § 6, 70 Stat. 599.[9]   The section giving D. C. Transit a measure of exclusivity is § 3, 70 Stat. 598, which protects it from any uncertified "competitive . . . bus line" for the "transportation of passengers of the character which runs over a given route on a fixed schedule . . . ."[10]   In determining what is "competitive" one must refer back to the sections which grant the franchise.

Even if §§ 1 and 3 together would protect "mass transportation" on the Mall from uncertified competition, and even if § 3 protects § 6 activity, it does not follow that D. C. Transit has a monopoly over sightseeing on the Mall.   Section 6 explicitly saves the "laws . . . of the District of Columbia," including the "exclusive charge and control" of the Secretary over the Mall.   D. C. Code § 8–108 (1967).   D. C. Transit admits the Secretary could exclude its sightseeing service from the Mall; if so, surely the franchise protection does not extend there. Moreover, §§ 3 and 6 together cannot confer a monopoly of Mall sightseeing both because this would involve an impairment of the Secretary's power under District law contrary to § 6, and because it would be unreasonable to construe the protection of § 3 against carriers uncerti-

---

[9] "The Corporation is hereby authorized and empowered to engage in special charter or sightseeing services subject to compliance with applicable laws, rules and regulations of the District of Columbia and of the municipalities or political subdivisions of the States in which such service is to be performed, and with applicable provisions of the Interstate Commerce Act and rules and regulations prescribed thereunder."

[10] "No competitive street railway or bus line, that is, bus or railway line for the transportation of passengers of the character which runs over a given route on a fixed schedule, shall be established to operate in the District of Columbia without the prior issuance of a certificate by the Public Utilities Commission of the District of Columbia . . . to the effect that the competitive line is necessary for the convenience of the public."

fied by the WMATC to apply where the WMATC has no powers of certification.

And even were § 3 so construed, its protection against "transportation of passengers of the character which runs over a given route on a fixed schedule" was evidently aimed at commuter service whose most important qualities are speed and predictability, not the service here whose most important qualities are interesting dialogue and leisurely exposure of the rider to new and perhaps unexpected experiences. The agenda of the tour will be varied by the Secretary according to the events of the day. The franchise does not protect D. C. Transit against competition in this sort of service on the Mall.

We reverse the judgment of the Court of Appeals and reinstate the judgment of the District Court. If the Congress, which has the matter before it, wishes to clarify or alter the relationship of these statutes and agencies, it is entirely free to do so.

*Reversed and remanded.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE STEWART concurs, dissenting.

We have said over and again that we do not sit to review decisions on local law by District of Columbia courts where the reach of that law is confined to the District. *District of Columbia* v. *Pace,* 320 U. S. 698, 702; *Busby* v. *Electric Utilities Union,* 323 U. S. 72, 75.

That law is not only peculiarly local; it is a compendium of a variety of laws drawn from numerous sources,*

---

*The law of the District of Columbia is (1) the principles and maxims of equity as they existed in England and in the Colonies in 1776; (2) the common law of England and the Acts of Parlia-

with which the judges in the District are much more familiar than are we. No legal problem is more obviously peculiar to the District than the one posed by the present case. Traffic, including the movement of tourists, is a special concern of local government. The District Court held that the Secretary of the Interior, not WMATC, was the appropriate licensing authority. The Court of Appeals by a two-to-one vote reversed but did not file an opinion because "the interests of the parties and of the public would be better served" by a prompt disposition of the case. The Court of Appeals *en banc*, two judges dissenting, denied a petition for rehearing.

The contrariety of views below suggests that this question of local law is not free from doubt. Certainly it is not a case where the decision is so palpably wrong as to make it the exceptional case for review by this Court. Nor is this question of local law so enmeshed with constitutional questions as to make appropriate its resolution here. See *District of Columbia* v. *Little,* 339 U. S. 1, 4, n. 1; *District of Columbia* v. *Thompson Co.,* 346 U. S. 100.

These considerations make much more appropriate here than in *Fisher* v. *United States,* 328 U. S. 463, 476 (from which the quotation is taken), the following observation:

> "Matters relating to law enforcement in the District are entrusted to the courts of the District. Our policy is not to interfere with the local rules of

---

ment which were in effect in the Colonies in 1776 (and which were not locally inapplicable); (3) the laws of Virginia and Maryland as they existed on February 27, 1801 (2 Stat. 103); (4) the Acts of the Legislative Assembly created by the Act of February 21, 1871 (16 Stat. 419); (5) all Acts of Congress applicable to the District. See District of Columbia Code (1940 ed.), Tit. 1–24, p. IX *et seq.;* Comp. Stat. D. C. 1887–1889, pp. V–VI.

law which they fashion, save in exceptional situations where egregious error has been committed.

"Where the choice of the Court of Appeals of the District of Columbia in local matters between conflicting legal conclusions seems nicely balanced, we do not interfere."

The present case could not be more precisely described.