EXECUTIVE LIMOUSINE SERVICE, INC., a Virginia Corporation,

Washington Metropolitan Area Transit Commission, Appellant,

v.

The Honorable Neil E. GOLDSCHMIDT, Secretary of the Dept. of Transportation, et al.

EXECUTIVE LIMOUSINE SERVICE, INC., a Virginia Corporation, Appellant,

Washington Metropolitan Area Transit Commission

v.

The Honorable Neil E. GOLDSCHMIDT, Secretary of the Dept. of Transportation, et al.

Nos. 78–1623, 78–1624.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 18, 1979.

Decided April 4, 1980.

Maxwell A. Howell, Washington, D. C., for appellant Executive Limousine Service, Inc., in No. 78–1624.

Gregory Paul Barth, Gen. Counsel, Washington Metropolitan Area Transit Commission, Washington, D. C., with whom Joel C. Weingarten, Associate Gen. Counsel, Washington Area Transit Commission, was on brief, for appellant in No. 78–1623.

William J. Birney, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert *, U. S. Atty., John A. Terry and Michael J. Ryan, Asst. U. S. Attys., Washington, D. C., were on brief, for appellees.

Also Gregory Paul Barth, Washington, D. C., entered an appearance for appellant Washington Metropolitan Area Transit Commission in No. 78–1624.

Before McGOWAN and LEVENTHAL **, Circuit Judges, and PENN ***, United States District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

This case presents a jurisdictional dispute between the Federal Aviation Administration (FAA) and the Washington Metropolitan Area Transit Commission (WMATC or Commission) over for-hire ground transportation of passengers from Dulles International Airport.

On June 30, 1976, Executive Limousine Service, Inc. (Executive), brought an action for declaratory judgment and for an injunction to prevent the FAA and Greyhound Corporation (Greyhound) from impeding Executive's efforts to offer certain transportation service at Dulles that had been authorized by the WMATC.[1] The Commission intervened as a plaintiff. The District Court initially issued a temporary restraining order, but then dissolved it and denied a preliminary injunction.[2] On appeal, this court affirmed the denial of the injunction.[3]

Cross-motions for summary judgment were then filed in the District Court, and a hearing was held on April 21, 1978. By Memorandum Opinion and Order filed May 3, 1978, the District Court granted the FAA's motion and dismissed the complaint.[4] This appeal followed.

For the reasons stated below, we reverse and remand to the District Court.

## I

On September 11, 1974, Executive and the FAA entered into a contract authorizing Executive to provide scheduled limousine service from Dulles to three hotels in

---

* United States Attorney at the time the brief was filed.

** Circuit Judge Leventhal was a member of the panel which considered this case but died before the opinion was issued.

*** Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Defendants are the Secretary of Transportation, the Administrator of the FAA, the Director of Metropolitan Washington Airports, the airport manager at Dulles, Greyhound Corporation, and Greyhound Airport Service, Inc., a District of Columbia corporation wholly owned by Greyhound.

2. *Executive Limousine Serv. v. Coleman*, No. 76–1210 (D.D.C. July 16, 1976).

3. *Id.*, No. 76–1734 (D.C. Cir. May 3, 1977).

4. *Id.*, No. 76–1210 (D.D.C. May 3, 1978).

the District of Columbia.[5]  The WMATC already had granted Executive a certificate of public convenience and necessity (certificate) for this service.  On March 26, 1976, Executive obtained a WMATC certificate to provide limousine service to a fourth hotel, the Hyatt Regency.[6]  The FAA permitted Executive to serve the Hyatt Regency on an interim basis until the expiration of its initial contract on June 30, 1976.  The FAA subsequently advised Executive that the expanded service could not be included in a proposed renewal contract because the FAA was party to a contract that purported to grant Greyhound the exclusive right to provide limousine service from Dulles, excepting only the three hotels that Executive already served.  Executive pointed out that it had obtained a certificate for the additional service from the WMATC.  The Director of the Metropolitan Washington Airports responded, on behalf of the FAA:

[T]he WMATC has the authority and responsibility to award certificates of public convenience and necessity for ground transportation within the Washington metropolitan area.  The Federal Aviation Administration (FAA), however, under our statutory authority for the operation of Dulles Airport and Part 159 of the Federal Aviation Regulations, has the right to control business activity at the airport, including the operation of motor vehicles for hire, by requiring that such activities be conducted under prescribed terms and conditions.  Specifically, this means that ground transportation for hire from Dulles Airport may not be provided unless that right is specifically granted by contract with the FAA.  *The fact that WMATC has awarded you a certificate of public convenience and necessity does not exempt you from the necessity of entering into a contract with the FAA for the right to operate motor vehicles for hire on the airport, nor does it require the FAA to enter into a contract for such purpose.*[7]

The FAA accordingly tendered a renewal contract that excluded service to the Hyatt Regency.  Executive signed it in order to continue operating, and instituted this action challenging the FAA's refusal to contract for the additional service.

Both the FAA and the WMATC assert jurisdiction over the transportation at issue here.  The Administrator of the FAA traces his authority over Dulles airport to the Second Washington Airport Act, *as amended* (the Act), D.C.Code §§ 7–1401–12 (1973), which Congress passed in 1950.  Section 7–1404 of the Act provides, in pertinent part:

The Administrator shall have control over and responsibility for the care, operation, maintenance, improvements, and protection of the airport, together with the power to make and amend such rules and regulations as he may deem necessary to the proper exercise thereof.

In addition, D.C.Code section 7–1406 in general terms grants the Administrator authority to contract for supplies and services at the airport:

The Administrator is authorized to contract with any person for the furnishing of supplies or performance of services at or upon the airport necessary or desirable for the proper operation of the airport, including but not limited to, contracts for furnishing food and lodging, sale of aviation fuels, furnishing of aircraft repairs and other aeronautical services, and such other services and supplies as may be necessary or desirable for the traveling public.

Control over ground transportation is not specifically granted in either section of the Act.

Acting, as he saw it, pursuant to the statutory authority contained in these provisions, the Administrator promulgated reg-

5.  The hotels were the Burlington Hotel, the L'Enfant Plaza Hotel, and the Quality Inn-Capitol Hill.

6.  The Hyatt Regency Hotel is located across the street from the Quality Inn-Capitol Hill.

7.  Joint Supplemental Appendix 20–21 (emphasis added).

ulations governing motor vehicles carrying passengers for hire at Dulles. Those regulations provide, in pertinent part:

(a) No person may operate a taxicab or other motor vehicle on Dulles International Airport for the purpose of picking up a passenger for hire unless he operates in accordance with one of the following conditions:

(1) He has a contract with the United States authorizing him to pick up passengers for hire on that airport.[8]

The WMATC, on the other hand, asserts jurisdiction under the Washington Metropolitan Area Transit Regulation Compact (the compact). Congress authorized this interstate compact in 1960 [9] and amended it to include Dulles in 1962.[10] Article I of the compact provides:

There is hereby created the Washington Metropolitan Area Transit District, hereinafter referred to as Metropolitan District, which shall embrace the District of Columbia, the cities of Alexandria and Falls Church, the counties of Arlington and Fairfax, and political subdivisions of the State of Virginia located within those counties *and that portion of Loudoun County, Virginia, occupied by the Dulles International Airport* and the counties of Montgomery and Prince Georges, in the State of Maryland and political subdivisions of the State of Maryland located within said counties, and all other cities now or hereafter existing in Maryland or Virginia within the geographic area bounded by the outer boundaries of the combined area of said counties, cities and airport. (Emphasis added.)

Article II sets forth the jurisdiction of the WMATC:

The signatories hereby create the "Washington Metropolitan Area Transit Commission," hereinafter called the Commission, which shall be an instrumentality of the District of Columbia, the Commonwealth of Virginia and the State of Maryland, and shall have the powers and duties set forth in this compact and such additional powers and duties as may be conferred upon it by subsequent action of the signatories. *The Commission shall have jurisdiction coextensive with the Metropolitan District for the regulation and improvement of transit and the alleviation of traffic congestion within the Metropolitan District* on a coordinated basis, without regard to political boundaries within the Metropolitan District, as set forth herein. (Emphasis added.)

Article XII describes the transportation services covered by the compact. It provides, in pertinent part:

This Act shall apply to the transportation for hire by any carrier of persons between any points in the Metropolitan District and to the persons engaged in rendering or performing such transportation service . . . .

## II

The parties agree that, pursuant to the Property Clause,[11] the Congress has plenary power over property that, like Dulles, belongs to the United States. They also agree that Congress may delegate some of its authority to an agency. The question presented by the instant case can be stated relatively simply: With respect to the regulation of ground transportation from Dulles, what authority was delegated to whom?

acted both to provide the consent of the District of Columbia to participate, *see id.; cf. Palmore v. United States,* 411 U.S. 389, 407, 408, 93 S.Ct. 1670, 1681, 1682, 36 L.Ed.2d 342 (1973) (Congress has plenary power to legislate for the District), and to signify its consent to the entire compact, *see* D.C.Code § 1–1410a (1973); U.S.Const. art. I, § 10.

**11.** U.S.Const. art. IV, § 3, cl. 2.

**8.** 14 C.F.R. § 159.4 (1979).

**9.** Act of September 15, 1960, Pub.L.No.86–794, 74 Stat. 1031, *codified at* D.C.Code § 1–1410 (1973). The original compact did not include Dulles within the Commission's jurisdiction because Dulles was not yet in operation.

**10.** Act of October 9, 1962, Pub.L.No.87–767, 76 Stat. 765, *codified at* D.C.Code § 1–1410a (1973). Congress' approval of the interstate compact carried dual significance. Congress

We think that Congress, in creating the WMATC and in specifically extending the WMATC's transportation authority to include Dulles Airport, intended that the WMATC regulate the transportation of passengers from the airport.

We have seen that Congress in 1950, in vague and general terms, gave the FAA "control over and responsibility for the care, operation, maintenance, improvements, and protection of the airport," D.C. Code § 7–1404, and also authority "to contract with any person for the furnishing of supplies or performance of services at or upon the airport," *id.* § 7–1406.[12] The regulation of ground transportation, however, is not specifically one of the FAA's responsibilities.

By contrast, Congress gave the WMATC authority that very specifically focused on the regulation of transportation in the metropolitan area,[13] including Dulles Airport.[14] The House Report that recommended extending WMATC jurisdiction to Dulles explained:

> . . . Dulles Airport is an integral part of the metropolitan area. Furthermore, transportation facilities to and from the airport must be coordinated with facilities that serve the metropolitan area . . . .[15]

The FAA concedes, as it must, that this grant of jurisdiction to the WMATC at least means that no carrier may serve Dulles without a WMATC certificate. Brief for Appellee at 16. The FAA insists, however, that it may deny contracts to carriers certified by the WMATC when another carrier already possesses an "exclusive" contract.

We do not agree. The FAA has statutory authority to *contract* with carriers,[16] but Congress designated the WMATC as the metropolitan area's master transportation *planner.* The House Report accompanying the WMATC compact urged that

> . . . immediate action be taken to improve the present public transit service by centralizing regulation of existing privately owned transit on a regional basis to overcome the barriers imposed by jurisdictional boundary lines . . . .
>
> \* \* \* \* \* \*
>
> Thus, the function of the instant compact is to improve transit service offered by the existing privately owned transit companies through coordinated regulation and improvement of traffic conditions on a regional basis.

H.R.Rep.No.1621, 86th Cong., 2d Sess. 5, 6 (1960).

We are left, therefore, with a confusing statutory scheme. On the one hand, Congress during the 1950's gave the FAA authority to enter into contracts for certain services at Dulles. On the other hand, Congress subsequently established the WMATC as the region's transportation planner "to simplify the regulation of transportation . . ., not to thrust it further into a bureaucratic morass." *Universal Interpretive Shuttle Corp. v. WMATC*, 393 U.S. 186, 193, 89 S.Ct. 354, 358, 21 L.Ed.2d 334 (1968). In light of these sentiments, did Congress intend that the WMATC compact strip the FAA of its contracting authority with respect to transportation?

**12.** Purporting to act pursuant to this statutory scheme, the FAA by regulation required carriers wishing to pick up passengers to obtain contracts with the FAA. Greyhound obtained an "exclusive contract" to provide bus service from Dulles. Excepting Executive's right to serve three hotels by limousine, Greyhound also had the "exclusive" right to provide limousine service from Dulles.

**13.** *See* note 9 and accompanying text *supra.*

**14.** *See* note 10 and accompanying text *supra.*

**15.** H.R.Rep.No.1979, 87th Cong., 2d Sess. 2 (1962) [hereinafter cited as *House Report*]; *see* S.Rep.No.2156, 87th Cong., 2d Sess. 2 (1962) [hereinafter cited as *Senate Report*]; 108 Cong.Rec. 21019 (1962); *Proposed Amendments to the Washington Area Transit Compact: Hearings on H.J.Res. 693 & H.J.Res. 694 Before a Subcomm. of the House Comm. on the Judiciary*, 87th Cong., 2d Sess. 6, 11 (1962) (statement of Delmer Ison) [hereinafter cited as *Hearings*].

**16.** *See* D.C.Code § 7–1406 (1973), *quoted on* pp. 117–118 *supra.*

We think not. Repeals by implication are disfavored.[17] If the Airport Act and the WMATC compact are "capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). The statutory scheme therefore must be construed in a manner that recognizes the role each agency is to play in managing transportation at Dulles.

Accordingly, we think the powers of the FAA and the WMATC must be complementary. It is for the WMATC to certify the number of carriers from Dulles that it thinks will best serve the public convenience and necessity. The FAA retains the authority to enter into contracts with certified carriers wishing to serve Dulles,[18] but the FAA may not deny a contract to a WMATC-certified carrier. A "bureaucratic morass" is precisely what would be created if the FAA unilaterally could eviscerate the WMATC's transportation plans by refusing to contract with a WMATC-certified carrier. *Cf. Universal Interpretive Shuttle Corp. v. WMATC*, 393 U.S. 186, 193, 89 S.Ct. 354, 358, 21 L.Ed.2d 334 (1968).

Congress' scheme does not, of course, prevent the FAA from offering its expert views about the number of carriers Dulles needs. Public hearings precede certification, and if the FAA thinks that only one carrier should serve Dulles,[19] the FAA may appear before the WMATC to oppose certification of additional carriers. However, under Congress' allocation of regulatory powers, the ultimate decision belongs to the WMATC, and the FAA may not render that decision nugatory by refusing to contract with a certified carrier.

The Supreme Court's decision in *Universal Interpretive Shuttle Corp. v. WMATC*, 393 U.S. 186, 89 S.Ct. 354, 21 L.Ed.2d 334 (1968), does not dictate a different result. *Interpretive Shuttle* involved a dispute between the WMATC and the Secretary of the Interior about regulatory authority over tours of the Washington D.C. Mall, a grassy park lined with national monuments and museums. The Universal Interpretive Shuttle Corp. had contracted with the Secretary to provide guided tours. Mall visitors could board "minibuses" that traveled among the various points of interest at speeds under 10 miles per hour while guides described the sights.

Although the tour company had an exclusive contract with the Secretary to provide these tours, it did not have a WMATC

17. *E. g., Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 189–90, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978); *Blanchette v. Connecticut General Insurance Corps., (Regional Rail Reorganization Act Cases)*, 419 U.S. 102, 133–34, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974).

18. The FAA's contract with carriers serves many purposes in addition to purporting to grant a carrier the right to exclusive service. Contracts to serve airports serve legitimate revenue-raising objectives. *See Toye Bros. Yellow Cab Co. v. Irby*, 437 F.2d 806, 808, 809, 811 (5th Cir. 1971). In this case, for example, Greyhound's contract required it to pay the government $21,000 per year plus 2% of the carrier's gross receipts from Dulles service in excess of $2.1 million, plus other miscellaneous charges and fees. The contract also provides for many of the details pertaining to service by the carrier, such as hours of service, equipment specifications, baggage handling instructions, and others.

19. Wise transportation policy may well call for awarding a certificate to one carrier only. The Court of Appeals for the Third Circuit noted, in a case also involving airport transportation:

> Under the [exclusive] agreement here involved the defendant Taxicab Association agreed to have at least 15 operating taxicabs available at the [St. Croix, Virgin Islands] Airport prior to arrival of all scheduled flights and upon reasonable notice during such irregular flight arrivals as the public convenience might require, and to increase the number of taxicabs upon request of the Government as the convenience of the airport might require. . . . *[I]t may very well be that the exclusion of other taxicab operators from entering the airport to pick up passengers at the terminal building was a reasonable condition by way of quid pro quo for the regular continuously available service which the defendant Taxicab Association undertook to furnish.*

*Southerland v. St. Croix Taxicab Ass'n*, 315 F.2d 364, 367 (3d Cir. 1963) (emphasis added) (footnote omitted).

certificate of public convenience and necessity. The WMATC, asserting that the interstate compact gave it jurisdiction, sought to enjoin the company from giving tours without a certificate. The tour company and the Secretary contended that Congress had given the National Park Service [20] "exclusive charge and control" [21] over the Mall, and that no WMATC certificate was necessary.

The Supreme Court held that the tour company need not obtain a WMATC certificate. The Court pointed out that the WMATC was created primarily to "simplify the regulation of . . . the mass transit of commuters and workers." *Id.* at 193, 89 S.Ct. at 358. By contrast,

> [a] system of minibuses, proceeding in a circular route around the Mall at less than 10 miles per hour, and stopping from time to time to describe the sights . . ., serves quite a different function.

*Id.* (footnote omitted). The Supreme Court also emphasized that the statute conferring jurisdiction over the Mall to the Park Service explicitly recognized the Service's authority to regulate Mall transportation. The Director of the Park Service was "authorized and empowered to make and enforce all regulations for the control of vehicles and traffic." *Id.* at 191, 89 S.Ct. at 357, *quoting* D.C.Code § 8–109 (1973).

The FAA argued, and the District Court agreed, that the denial of jurisdiction to the WMATC in *Interpretive Shuttle* is controlling here. We reject the analogy. The differences between *Interpretive Shuttle* and the instant case are significant. First, the transportation provided is entirely dissimilar. The ground transportation problems presented by increasing air-passenger volume prompted Congress to extend the WMATC's jurisdiction to include Dulles.[22] The unusual speed of air flights sometimes is undercut by disproportionate waiting time and delay in ground transportation. Efficient and adequate ground transportation from Dulles to the metropolitan area therefore is an important component of the regional transportation system that Congress wanted the WMATC to regulate. Guided minibus tours of monuments are hardly equivalent to the mass ground transportation of air travelers.

The text of the relevant statutes also demonstrates the weakness of the government's analogy to *Interpretive Shuttle*. In *Interpretive Shuttle*, Congress had explicitly given the power to regulate transportation to the Department of the Interior. *Id.* Here, by contrast, Congress never has given the FAA *explicit* authority to regulate transportation,[23] and, in any event, nothing in the compact purported to save for the FAA transportation regulatory authority at Dulles.[24]

For all these reasons we hold that decisions about the public convenience and necessity in providing transportation service at Dulles must be made by the WMATC. As we have noted, the FAA is free to appear before the WMATC to present its views about proposed transportation service. The FAA must, however, offer contracts on a nondiscriminatory basis to all carriers once they are certified.

The regulatory scheme that Congress has created presents the danger that bureaucratic feuding between the FAA and WMATC may disserve the public interest in providing efficient ground transportation

---

**20.** The National Park Service is an agency of the Department of the Interior. 16 U.S.C. § 1 (1976).

**21.** *See* D.C.Code § 8–108 (1973).

**22.** *See* note 15 and accompanying text *supra.*

**23.** *See* D.C.Code §§ 7–1404, 7–1406 (1973), *quoted on* p. 117 *supra.*

**24.** The only reservation expressed by the FAA in 1962 with respect to the WMATC's jurisdiction was that the WMATC would attempt to interfere with the FAA's regulation of *air-taxi* operations at airports. *House Report, supra* note 15, at 17–18 & *Senate Report, supra* note 15, at 17–18 (comments of FAA Administrator N.E. Halaby). Moreover, the WMATC executive director asserted at hearings preceding the 1962 amendments to the compact that the WMATC possessed jurisdiction over airport transportation. *Hearings, supra* note 15, at 14 (remarks of Delmer Ison). This assertion was not contradicted.

from Dulles. The parties "show at the outset their inability to agree by presence on the opposite sides of this lawsuit." *Universal Interpretive Shuttle Corp. v. WMATC*, 393 U.S. at 191, 89 S.Ct. at 357. Moreover, our impression of the relationship between the FAA and the WMATC is that, in the past, both seem to have made it a point of punctilio not to deal with one another—much less to cooperate—lest either appear to be yielding authority. This attitude is especially dangerous in light of Congress' delicately balanced allocation of authority. We have shown that Congress wanted the WMATC to *regulate* transportation, but also provided that the FAA could *enter into contracts* with carriers wishing to provide it. Neither agency should use its authority to frustrate the efforts of the other. What is needed is for the parties to develop a *modus vivendi* for the benefit of the traveling public.

With this in mind, we reverse and remand to the District Court for further proceedings consistent with this opinion.

*It is so. ordered.*