**SUMMER'S BEST TWO WEEKS, Petitioner**

v.

**DEPARTMENT OF CONSERVATION AND NATURAL RESOURCES Of the COMMONWEALTH of Pennsylvania; Michael DiBerardinis, in his official capacity as Secretary of the Department of Conservation and Natural Resources of the Commonwealth of Pennsylvania; Roger Fickes, in his official capacity as Director of the Pennsylvania Bureau of State Parks; and John Hallas, in his official capacity as Superintendent of Ohiopyle State Park, Respondents.**

Commonwealth Court of Pennsylvania.

Argued April 7, 2008.

Decided July 25, 2008.

---

Jeff Rowes, Arlington, VA, for petitioner.

Michael L. Harvey, Sr. Deputy Attorney General, Harrisburg, for respondents.

BEFORE: McGINLEY, Judge, PELLEGRINI, Judge, and LEAVITT, Judge.

OPINION BY Judge McGINLEY.

Summer's Best Two Weeks (Camp) filed a Petition for Review in equity in this Court's original jurisdiction seeking a declaration that the decision of the Pennsylvania Department of Conservation and Natural Resources' (DCNR) to prohibit the Camp from conducting regular whitewater rafting trips on the Lower Youghiogheny River (Lower Yough) within Ohiopyle State Park (State Park) violated the substantive due process principles of Article I, Section 1 of the Pennsylvania Constitution.[1] The Camp also seeks an injunction directing the DNCR to allow the Camp to conduct whitewater rafting trips through the private boater launch reservation and quota system. The Camp has filed a motion for summary judgment and the DCNR responded with a cross-motion for summary judgment on both causes of action which are presently before this Court for disposition.[2]

1. *Factual Background*

The Camp is a nonprofit, nondenominational Christian summer camp located in Boswell, Pennsylvania. Since 1970, the Camp has conducted its own annual whitewater rafting trips on the Lower Yough as part of its program for campers.

Campers pay a fee to attend the Camp, part of which is allocated to pay the rafting trip leaders and to purchase and maintain rafts and rafting equipment. Joint Stipulation of the Parties (Joint Stipulation), January 31, 2008, Nos. 12, 18. The Camp determines which campers are permitted to raft based on an assessment of each camper's emotional and physical maturity. All campers pay the same fee regardless of participation in the rafting trip.

The State Park is operated by the DCNR. Approximately 14 miles of the Lower Yough, containing Class III and IV whitewater rapids, traverses through the State Park.

Since 1970, over 15,000 campers and rafting counselors have rafted the Lower Yough without any accidents or fatalities according to the DCNR's records. Joint Stipulation, Nos. 2, 3.

In 1973, in an effort to control and monitor river traffic, the Department of Environmental Resources (Department), which was the predecessor to DCNR, commissioned Dr. Charles H. Strauss (Dr. Strauss) to conduct a study to ascertain river traffic quotas. Joint Stipulation, Exh. A, A Simulation Analysis of White–Water Boating in Ohiopyle State Park (1977 Strauss Report), April 4, 1977. The 1977 Strauss Report concluded that the Lower Yough could only support approximately 2,000 boaters per day. Joint Stipulation, Exh. A, 1977 Strauss Report at 36. The 1977 Strauss Report proposed a system where approximately half that number would be allocated to four existing commercial outfitters and the other half to private boaters. The 1977 Strauss Report concluded that commercial outfitters

---

1. Article I, Section 1 of the Pennsylvania Constitution provides "[a]ll men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."

2. Summary judgment is proper in cases that are clear and free from doubt. *Washington v.* *Baxter*, 553 Pa. 434, 719 A.2d 733 (1998). It should only be granted if there exists no genuine issue of material fact. *Jones v. Cheltenham Township*, 117 Pa.Cmwlth. 440, 543 A.2d 1258 (1988). The record must be reviewed in the light most favorable to the non-moving party, and all doubts must be resolved against the moving party. *Murphy v. Duquesne Univ. of the Holy Ghost*, 565 Pa. 571, 777 A.2d 418 (2001).

should be limited to four to ensure the guide service would remain economically viable and available to the public. Joint Stipulation, Exh. A, 1977 Strauss Report at 39–40.

Following the 1977 Strauss Report, the Department executed four identical concession license agreements with the existing outfitters[3] to conduct rafting trips on the Lower Yough pursuant to its authority under Section 313 of the Conservation and Natural Resources Act (Act), Act of June 28, 1995, P.L. 89, 71 P.S. § 1340.313(a). Joint Stipulation, No. 25. The DCNR also implemented a launch reservation and quota system for private boaters. Presently, the DCNR regulates boater use of the Lower Yough through executed concession license agreements[4] and the private boater quota system implemented in 1978.[5]

The Camp conducted its annual trips on the Lower Yough using the quota system as a private boater until 1984. In 1984, the Department advised the Camp that it was "engaged in commercial activity"[6] as

an unlicensed outfitter in violation of 17 Pa.Code § 11.209(a)(5) and to stop rafting or use one of the commercial outfitters. 17 Pa.Code § 11.209(a)(5) states:

§ 11.209. Miscellaneous activities.

a) The following activities are prohibited without written permission of the Department:

* * * *

(5) Engaging in commercial activity.

In 1987, however, William C. Forrey, Director of the Bureau of State Parks, granted the Camp express written permission to continue rafting the Lower Yough based upon the quota system available to private boaters. Petition for Review, Exh. D, Letter from William C. Forrey, March 26, 1987.

Beginning in 1998, the DCNR reevaluated groups rafting the Lower Yough under the private boater quota system to determine if any groups were operating as commercial outfitters without a concession license. In 2001, the DCNR again determined that the Camp was "engaged in

---

3. The existing commercial outfitters included Wilderness Voyageurs, Laurel Highlands River Tours, White Water Adventurers, and Mountain Streams and Trails. In 2001, Mountain Streams and Trails was purchased by Ohiopyle Trading Post.

4. Under the terms of the concession agreement each outfitter is required to: (1) pay the Commonwealth a license fee of 7.5% of its adjusted gross receipts; (2) meet license specifications for its rafts, kayaks and equipment; (3) use qualified rafting guides; (4) agree to periodic maintenance inspections; (5) limit trip size and frequency; and (6) hold the Commonwealth harmless and indemnify it from any claims made against it by reason of the licensed outfitter's guided trips down the Lower Yough. Joint Stipulation, No. 26. A licensee's failure to comply with any of the provisions subjects the outfitter to termination of the license agreement.

5. The quota system permits up to 50 private rafters to launch every half hour between 7:45

a.m. and 2:45 p.m., plus 30 hardboaters, such as kayakers, every hour for a daily total of 960 private boaters. Private boaters make reservations in advance by calling the DCNR or via the Internet. Each private boater must pay a three dollar launch fee on the busiest days. Clients of the outfitters are not required to make reservations in advance or pay a separate launch fee.

The outfitters are allowed to launch up to 80 boaters every half hour between 8:00 a.m. and 3:00 p.m. for an equivalent total of 960 boaters per day. The outfitters rotate so that each guide service gets three 90–boater launches per day. There is no separate user fee for outfitter clients, but the outfitters do remit 7.5 percent of gross revenues to the Commonwealth. Joint Stipulation, No. 29.

6. Commercial activity includes "[a]n activity in which a person directly or indirectly accepts consideration of value as compensation for the provision of goods or services, including transportation." 17 Pa.Code § 11.201.

commercial activity" as an unlicensed outfitter. The DCNR effectively withdrew its earlier permission and refused to allow the Camp to guide whitewater trips under the private boater quota system. Instead, the Camp was again instructed to use a licensed commercial outfitter to raft the Lower Yough. Petition for Review, Exh. E, Letter from Douglas Hoehn, February 28, 2001.

The Camp, however, has decided not to conduct rafting trips using the commercial outfitters, citing financial infeasibility and incompatibility with the Camp's core mission. Although the DCNR may grant a special use permit to allow a commercial group to raft the Lower Yough, they have not granted the Camp a permit. The Camp has not rafted the Lower Yough since 2002.

### 2. *Commercial Activity*

The Camp does not dispute that its rafting trips constitute "commercial activity." See Camp's Answers to DCNR's Interrogatory No. 7. However, the Camp challenges the constitutionality of the regulation and the DCNR's interpretation of the regulation as it applies to the Camp.[7]

It is well-established that courts defer to an administrative agency's interpretation of its own regulations unless that interpretation is unreasonable. *Pelton v. Department of Public Welfare*, 514 Pa. 323, 523 A.2d 1104 (1987). Critically, the Camp concedes that it is engaging in "commercial activity." So the initial inquiry for this Court must be whether the DCNR is interpreting and applying the regulation to the Camp in a reasonable manner. We think it is.

In *United States v. Carter*, 339 F.Supp. 1394 (D.Ariz.1972), a controversy with similar facts, the court upheld the Secretary of the Interior's interpretation and application of regulation 36 C.F.R. § 5.3 which prohibited anyone from "engaging in or soliciting any business in park areas, except in accordance with provisions of a permit, contract, or other written agreement with the United States...." Although we are not bound by the holding in *Carter*, this Court finds it to be persuasive.

In *Carter*, the defendant Warren G. Carter (Carter) had rented boats in the town of Page, Arizona, outside the boundaries of the Glen Canyon National Recreational Area (Glen Canyon). The rental of a boat included the service of launching the boat on Lake Powell which was within Glen Canyon. In addition, Carter provided a guide service for fishing and sightseeing trips on Lake Powell within Glen Canyon. Because Carter launched boats guided by his agents, the court found he had engaged in business within the recreation area within the meaning of 36 C.F.R. § 5.3. Carter, however, did not have a permit or agreement allowing him to do so.

Carter was advised by the National Park Service that business operations could be conducted within the boundaries of the recreation area only with permission of the United States pursuant to 36 C.F.R.

---

7. Although the Camp frames the issue in terms of constitutionality, this Court discerns the matter as one of regulatory interpretation.

The Camp neither challenges the constitutionality of the DCNR's promulgation of the regulation nor the DCNR's regulation of commercial activity in state parks. It appears, in fact, that the Camp concedes the regulation giving the DCNR the authority to limit commercial activity is constitutional. Instead, the Camp challenges the DCNR's interpretation and application of the regulation against the Camp and argues that requiring the Camp to adhere to the regulation is unconstitutional as it is not rationally related to any legitimate state interest since the Camp, *inter alia*, had an exemplary safety and environmental record, offered to pay a reasonable user fee, and did not impact the public's ability to raft.

§ 5.3. Carter then requested a permit from the superintendent of the recreation area for the right to provide his services. The superintendent advised Carter that such a permit would not be issued because the concessioner in the recreation area, Canyon Tours, Incorporated, had reasonably supplied the type of service Carter sought to provide and the issuance of such a permit would "constitute a hazard to the [present] concessioner[ ]". *Id.* at 1396. The government sought to enjoin Carter's business operations within Glen Canyon and the court granted the injunction.

In *Carter,* the court found that statutory and case law dictated that Congress intended the Secretary of the Interior to regulate business activities such as defendant's. The court explained:

> Congress has since the inception of the modern-day park system given the Secretary the general power to construct and maintain recreational facilities in park areas so that they may be preserved for posterity. 16 U.S.C. § 1 (1916). He was also given the power to let contracts to responsible individuals or corporations to provide the services he felt were necessary to carry out that purpose. 16 U.S.C. § 3 (1916); 16 U.S.C. § 17b (1930). The courts interpreted this language to give the Secretary the right to let contracts to concessions and to exclude all other competition from the park area, whether the service provided concerned the land [*Robbins v. United States, supra,* 284 F. 39 (8th Cir.1922)] or water [*United States v. Gray Line Water Tours of Charleston, supra,* 311 F.2d 779 (4th Cir.1962)]. . . .

*Id.* at 1398.

Although Carter asserted that the superintendent of the recreation area acted arbitrarily when his request for a permit

to engage in business was denied the court found:

> [i]n 16 U.S.C. § 20 (Supp.1965), the Secretary is required to administer the national park system in a manner to insure the public enjoyment and to preserve its beauty and enjoyment to future generations. In furtherance of that goal, the Secretary is directed to encourage concessioners to provide facilities and services for the public in park areas. These sections acknowledge the need that all business activities in the park areas be carefully controlled and give the Secretary the right to vest in single concessioners the right to provide all services within any given park unit. *Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit [Comm'n,* 393 U.S. 186, 89 S.Ct. 354, 21 L.Ed.2d 334 (1968)]. . . .

In *Carter,* the regulatory language of 36 C.F.R. § 5.3 prohibiting anyone from "engaging in . . . any business in park areas . . ." without a "permit, contract, or other written agreement with the United States . . ." is similar to the regulatory language of 17 Pa.Code § 11.209(a)(5) prohibiting anyone from "engaging in commercial activity" without the written permission of the DCNR.

The court in *Carter* accepted the government's interpretation that Carter's specific activity of launching guided boats meant Carter engaged in business within the recreation area within the meaning of 36 C.F.R. § 5.3. Similarly, here, the DCNR interpreted 17 Pa.Code § 11.209(a)(5) to conclude that the Camp's activity of arranging guided whitewater rafting trips down the Lower Yough and charging fees to all campers, part of which were allocated to compensate Camp employees serving as guides, meant the Camp engaged in commercial activity in the State Park within in the meaning of the regulation.

In *Carter*, it was recognized that Congress intended to charge the Secretary with the administration of the statute. The Court acknowledged that the Secretary was given the authority to publish regulations for the administration of park areas "as he may deem necessary or proper for the use and management of the parks...." 16 U.S.C. § 3 (1916). The Secretary interpreted the statute to include a right to control business activities within Glen Canyon. Pursuant to 16 U.S.C. § 3 (1916), the Secretary of the Interior promulgated 36 C.F.R. § 5.3 prohibiting individuals from "engaging in or soliciting any business in park areas...." Consistent with the statutory authority, the Secretary determined that Carter was violating the regulation.

Much like the Congress in *Carter*, here, the General Assembly has authorized the DCNR to regulate all commercial activity within the State Park. Here, the General Assembly authorized the DCNR to promulgate such rules and regulations "for the control, management, protection, utilization, development, occupancy and use of the lands and resources of State Parks as it may deem necessary or proper to conserve the interests of the Commonwealth." Section 313(a) of the Act. The government interpreted the statute to include a right to regulate all commercial activity within any State Park. Pursuant to Section 313(a), the DCNR promulgated 17 Pa.Code § 11.209(a)(5) prohibiting all commercial activity in any state park without the written permission of the DCNR.

Ohiopyle State Park is a "State Park" and the DCNR has the authority to regulate activities within its own parks.

In *Carter*, after it had been determined that Carter was "engaging in ... business in [a] park area[ ] ...", Carter requested a permit to continue engaging in business in the park in compliance with the federal regulation. Carter was denied a permit. The court upheld the denial because the regulation authorized the Secretary to regulate all business activities within the park, including the issuance or denial of a permit, contract or written agreement to engage in any business in the state park.

Here, the DCNR has determined the Camp wishes to engage in commercial activity, and the Camp has conceded the same. The Camp previously attempted to negotiate with the DCNR for the receipt of a special use permit for the Camp to raft the Lower Yough. However, the DCNR decided not to grant the permit. Petitioner's Brief in Support of its Motion for Summary Relief, February 1, 2008, Exh. 20, Welch Affidavit, No. 21 at 6.

Unfortunately for the Camp, like the federal regulation, 17 Pa.Code § 11.209(a)(5) specifically and unequivocally, prohibits all commercial activity in any state park without the written permission of the DCNR.

This Court must conclude that the Camp is precluded from engaging in commercial activity inside the State Park without the DCNR's written permission as a matter of regulatory interpretation.[8]

---

8. Because of this conclusion, it is unnecessary to address the Camp's constitutional arguments.

"When a case raises both a constitutional and a non-constitutional issue, a court should not reach the constitutional issue if the case can properly be decided on non-constitutional grounds." *P.J.S. v. Pa. State Ethics Comm'n*, 555 Pa. 149, 723 A.2d 174, 177, *citing Mt.*

*Lebanon v. County Bd. of Elections*, 470 Pa. 317, 368 A.2d 648, 650 (1977). Here, our resolution of the non-constitutional issue regarding the reasonableness of the DCNR's interpretation of its regulation disposes of the controversy whether the DCNR properly precluded the Camp from rafting the Lower Yough. Specifically, the DCNR properly interpreted and applied its regulation in a rea-

The DCNR's cross-motion for summary relief is granted and judgment is entered in its favor. Further, the Camp's motion for summary relief is denied.

## ORDER

AND NOW, this 25th day of July, 2008, Respondent's Cross–Motion for Summary Relief is granted and Petitioner's Motion for Summary Relief is denied. Judgment is entered in favor of the Respondent.

CONCURRING OPINION BY Judge LEAVITT.

I write separately only to note that Summer's Best Two Weeks may not be a commercial activity within the meaning of 17 Pa.Code § 11.209(a)(5). However, Summer's Best conceded this point in its litigation. Should it apply for one or more of the 960 private boating permits authorized for issuance each day on the Lower Yough and its application be denied, it can appeal in accordance with the Administrative Agency Law, 2 Pa.C.S. §§ 501–504, 701–704.

sonable manner to prevent the Camp from engaging in commercial activity within a state park, therefore, it is not necessary to address the constitutional question of whether the DCNR's act of barring the Camp from the river was unconstitutional as a wholly arbitrary denial of liberty in violation of the due process rights safeguarded by Article I § 1 of the Pennsylvania Constitution and not rationally related to any legitimate state interest.