**NATIONAL WILDLIFE FEDERATION, Wyoming Wildlife Federation, Plaintiffs,**

**v.**

**NATIONAL PARK SERVICE, U.S. Fish and Wildlife Service, Department of the Interior, Defendants.**

**No. C86–097–K.**

United States District Court, D. Wyoming.

Sept. 9, 1987.

385

Thomas France, Nat. Wildlife Federation, Missoula, Mont., and Rodger McDaniel, Southeast Wyoming Law Office, Cheyenne, Wyo., for plaintiffs.

Lee M. Kolker, U.S. Dept. of Justice, Land and Natural Resources Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION SUSTAINING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KERR, District Judge.

The above-entitled matter comes before this Court on cross-motions for summary judgment, the parties having stipulated to submission of the issues on briefs without the necessity of oral argument.

This action arises as a result of an administrative decision by the National Park Service (Park Service) to keep the Fishing Bridge Campground operating at a reduced level pending the findings of an Environmental Impact Statement (EIS) pertaining to the effect this campground has on the survival of the grizzly bear, a threatened species. As a part of Yellowstone National Park since 1901, Fishing Bridge bears witness to some of the most awe-inspiring and

breathtaking scenery, unrivaled in its splendor. In the midst of this grandeur has surfaced a conflict, hardly uncommon to the courts, between man and the animal kingdom.

It is indeed a sad postscript that man's quest for satisfaction has in one way or another led to the destruction, sometimes to the point of extinction, of creatures of extraordinary beauty. Today, the grizzly bear is among the almost 600 species of wildlife designated as threatened or endangered. 50 C.F.R. § 17.11(h). Among the habitats of this threatened species is the area encompassed by the Fishing Bridge Campground. It is with acute awareness of the plight of this nation's threatened and endangered species that this Court proceeds.

The plaintiffs National Wildlife Federation and Wyoming Wildlife Federation assert that as a result of the decision to continue operations at Fishing Bridge Campground, the defendants National Park Service, the United States Fish and Wildlife Service, and the United States Department of Interior are in direct violation of provisions contained in the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, the National Park Service Organic Act, 16 U.S.C. § 1 *et seq.*, the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*, and the Concessions Policy Act, 16 U.S.C. § 20 *et seq.* Each of these will be addressed in turn in the course of this Memorandum Opinion.

All parties have moved for summary judgment. To prevail on a motion for summary judgment, it must be demonstrated to the Court that there exist no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Rule 56(c) of Fed.R.Civ.P. This Court is in agreement with the parties that there exist no genuine issues as to any material fact, thus rendering the matter ripe for summary judgment.

## I. ENDANGERED SPECIES ACT

Prior to passage of the Endangered Species Act (ESA), Congress had repeatedly been warned that if nothing were done in the way of legislation, wildlife extinction would occur at an alarming rate. A stark reminder was given to Congress as to the cause of the problem:

[M]an and his technology has [sic] continued at an ever-increasing rate to disrupt the natural ecosystem. This has resulted in a dramatic rise in the number and severity of the threats faced by the world's wildlife. The truth in this is apparent when one realizes that half of the recorded extinctions of mammals over the past 2,000 years have occurred in the most recent 50–year period.

Hearings on Endangered Species before the Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House Committee on Merchant Marine and Fisheries, 93d Cong., 1st Sess. 202 (1973) (statement of Assistant Secretary of the Interior Nathaniel P. Reed).

Congress' response was a revitalized Endangered Species Act, one that, in the words of Chief Justice Burger, writing for the Court, "indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 174, 98 S.Ct. 2279, 2292, 57 L.Ed.2d 117 (1978). As enunciated by Congress in the opening paragraphs of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, the purposes behind the Act were

... to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

16 U.S.C. § 1531(b). Congress went on to declare that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." 16 U.S.C. § 1531(c)(1).

The Act empowers the Secretary of Interior to promulgate regulations for the determination of endangered or threatened

species. 16 U.S.C. § 1533(a)(1). Once a species has been so classified, the Secretary is instructed to "issue such regulations as he deems necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d).

Two provisions are of particular import in this matter. They provide as follows:

(1) The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title.

(2) Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use *the best scientific and commercial data available.*

16 U.S.C. § 1536(a)(1), (2) (emphasis supplied).

The plaintiffs argue that the factual record prepared by the Park Service does not support leaving the Fishing Bridge Campground open. It is undisputed that the Park Service initially recommended the closing of Fishing Bridge; however, in 1984, the Park Service, acting under the mandate of the National Environmental Protection Act, 42 U.S.C. § 4321 *et seq.*, decided to prepare an Environmental Impact Statement analyzing the impact, in its entirety, of the operation of Fishing Bridge and another campground.

The Court finds no inappropriate behavior on the part of the Park Service in pursuing to make assessments via an EIS. The Court further notes that the Park Service, cognizant of its duties under the ESA to use "the best scientific and commercial data available" will utilize a newly developed computer analysis model that represents the most sophisticated method to date to measure the impact that human activities have on the grizzly bear. Until the results of that EIS are released, sometime this year or early next year, the Park Service has developed an Interim Management Plan to govern activities at Fishing Bridge. Administrative Record, Tab 14. The Park Service seeks this Court's approval to operate Fishing Bridge under this Plan until an EIS is completed.

Following its duty under §§ 1536(a)(2) and 1536(c)(1), the Fish and Wildlife Service concluded that operation of the Fishing Bridge Campground under the Interim Management Plan would not jeopardize the continued existence of the grizzly bear. Against this background, the Court has every confidence in the Park Service plan and, therefore, it is without hesitation that this Court is inclined to grant the motion of the Park Service to continue operating Fishing Bridge under the Interim Management Plan pending the results of the EIS.

### A. Conservation

■ Plaintiffs assert that this Court must find that the ESA clearly requires all federal agencies to formulate programs designed to protect and conserve endangered or threatened species. While the affirmative nature of § 1536(a)(1) is beyond dispute, the definition of conservation in § 1532 provides some discretion among conservation measures. The Act defines conservation as:

... the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and

procedures *include, but are not limited to,* all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

16 U.S.C. § 1532(3) (emphasis supplied).

A mere cursory reading of this definition supports the Secretary's discretionary powers as to methods of conservation. However, more than a cursory reading is required to support the Secretary's discretion when it comes to §§ 1536(a)(1) and (2).

The purpose of § 1536(a)(2) is to ensure that the government does not undertake actions, such as building a highway, that incidentally jeopardize the existence of endangered or threatened species. *Carson-Truckee Water Conservancy District v. Clark,* 741 F.2d 257, 262 (9th Cir.1984), *cert. denied,* 470 U.S. 1083, 105 S.Ct. 1842, 85 L.Ed.2d 141 (1985). The purpose behind § 1536(a)(1) is to authorize the Secretary and various federal agencies to dedicate all means at their disposal to the conservation of endangered or threatened species. In the instant case, as in *Carson-Truckee,* the Secretary and the Park Service have not *undertaken* a project that threatens the existence of an endangered or threatened species. Rather, the Park Service has acted pursuant to § 1536(a)(1) by implementing a very concise and aggressive management plan that has as its ultimate goal the preservation of the grizzly bear and the eventual recovery of the grizzly so as to one day remove it from the ranks of the ESA. Administrative Record, Tab 14, p. 1. Additionally, the interim nature of the plan cannot be forgotten. When the EIS is released, then will come the decision as to the fate of Fishing Bridge. Until then, this Court sees no reason why the status quo cannot be maintained through enforcement of the Interim Management Plan.

### B. Recovery Plans

■ A related argument concerns the implementation of recovery plans as per 16 U.S.C. § 1533(f). That section, in relevant part, provides as follows:

The Secretary shall develop and implement plans (hereinafter ... referred to as 'recovery plans') for the conservation and survival of endangered species and threatened species ..., *unless he finds that such a plan will not promote the conservation of the species.* The Secretary, in developing and implementing recovery plans ... shall, to the maximum extent practicable, give priority to those endangered species or threatened species most likely to benefit from such plans, particularly those species that are, or may be in conflict with construction or other developmental projects or other forms of economic activity....

16 U.S.C. § 1533(f) (emphasis supplied).

Plaintiffs would urge upon this Court that the language of § 1533(f) obligates the Secretary to develop and implement a recovery plan, and that, once developed, all concerned agencies must adhere to it. The language does not so say. The Secretary is required to initiate a recovery plan "unless he finds that such a plan will not promote the conservation of the species." *Id.*

Plaintiffs further argue that since a grizzly bear recovery plan was already developed, the Park Service and the Secretary cannot later selectively decide which provisions to go forward with. To adopt such a position completely misconstrues congressional intent. The provision for recovery plans was added in 1978, at which time the House reported the following:

Although recovery plans are implicit in the Endangered Species Act, the Act does not specifically mandate recovery plans ... The committee intends the Secretary to establish recovery teams to assist with: (1) the development of plans; (2) periodic amendment of plans; and (3) the implementation of the plans ...

H.R. 1625, 95th Cong., 2d. Sess. (1978), p. 19, U.S.Code Cong. & Admin.News 1978, pp. 9453, 9469. Congressional intent supports the view that the Secretary is required to develop a recovery plan only inso-

far as he reasonably believes that it would promote conservation. This Court will not attempt to second guess the Secretary's motives for not following the recovery plan. The Court finds that, confronted with newer and more sophisticated methods available to determine the effect that continued operation of Fishing Bridge would have upon the grizzly bear, the Secretary could reasonably have concluded that the implementation of such a plan should be stayed until the results of this new analysis become available through an EIS. For the above-stated reasons and for reasons to be addressed in the section on the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.,* this Court will not disturb, for the time being, the management decisions made by the defendants.

### C. Taking

■ Plaintiffs assert that the continued operation of Fishing Bridge constitutes a "taking" under the ESA. The ESA defines the term "take" as meaning "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). In the implementing regulations to the ESA, "harm" in regard to taking is defined as:

... an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3.

While taking is generally prohibited, exceptions are allowed both in the ESA and its implementing regulations. In relevant part, some of these exceptions read as follows:

\* \* \* \* \* \*

(B) Grizzly bears may be taken in self-defense or in defense of others, but such taking shall be reported within 5 days of occurrence ...

\* \* \* \* \* \*

(C) Removal of nuisance bears. A grizzly bear constituting a demonstrable but

non immediate threat to human safety or committing siginficant [sic] depredations to lawfully present livestock, crops or beehives may be taken, but only if:

(1) It has not been reasonably possible to eliminate such threat or depredation by live-capturing and releasing unharmed in a remote area the grizzly bear involved ...

\* \* \* \* \* \*

(D) Federal, State, or Tribal scientific or research activities. Federal, State, or Tribal authorities may take grizzly bears for scientific or research purposes, but only if such taking does not result in death or permanent injury to the bears involved ...

50 C.F.R. § 17.40(b)(i)(B), (C), and (D).

The biological opinion issued by the Fish and Wildlife Service indicates that the Interim Management Plan is designed to reduce the conflicts between man and the grizzly bear. In fact, in the first season of operation under the Interim Management Plan, there were no bear mortalities. This Court is hard-pressed to understand how, under such circumstances, the continued operation of Fishing Bridge until the results of the EIS are received would constitute a taking.

■ Related to the taking issue is the so-called "incidental taking." Incidental takings are defined as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02. Plaintiffs contend that the ESA requires that an incidental taking statement be included in the biological opinion on the Interim Management Plan. Defendants, on the other hand, contend that no such statement is required if no incidental takings are foreseen. Defendants have indicated that no prohibited takings were anticipated as a result of the implementation of this Plan. The relevant portions of the ESA provide as follows:

If after consultation under [§ 1536(a)(2)], the Secretary concludes that—

**390**

(A) the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection; and

(B) the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection;

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that—

(i) specifies the impact of such incidental taking on the species,

(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact, and

(iii) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clause (ii).

16 U.S.C. § 1536(b)(4). A careful reading of this provision supports defendants' contentions.

### D. Irreversible or Irretrievable Commitment of Resources

 The Court further finds that the decision by the Park Service to operate Fishing Bridge at a reduced level pending the findings in the EIS is not an "irreversible or irretrievable commitment of resources ... which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures ...," as proscribed by 16 U.S.C. § 1536(d). As soon as the results of the EIS become available, the Interim Management Plan may be terminated, modified, or made permanent depending upon the EIS findings.

This section was enacted by Congress mainly to prevent incidents such as the more than $50 million loss at Tellico Dam as a result of *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). As Judge Aubrey E. Robinson, Jr. noted in regard to § 1536(d):

[It was designed] to preclude the investments of large sums of money in any endeavor if (1) at the time of the investment there was a reasonable likelihood that the project, at any stage of development, would violate [§ 1536(d)] and (2) that investment was not salvageable (i.e. it could not be applied to either an alternative approach to the original endeavor or to another project).

*North Slope Borough v. Andrus,* 486 F.Supp. 332, 356 (D.D.C.1980), *aff'd in part, rev'd in part* on other grounds 642 F.2d 589 (D.C.Cir.1980) (footnotes omitted). Nothing even as remotely extreme as what was encountered with Tellico Dam is involved here. The flexibility of the Interim Management Plan speaks for itself.

## II. NATIONAL PARK SERVICE ORGANIC ACT

The National Park Service Organic Act, 16 U.S.C. § 1 *et seq.*, established the National Park Service. It lists the duties of the Park Service as follows:

... [The Park Service] shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified, ... by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1.

The Park Service carries out a multiple charge under the Organic Act. While the Park Service is clearly responsible for the preservation of grizzly bears, it is also charged with "promoting" and "providing for the enjoyment" of park resources. The adoption of the Interim Management Plan and the entire process that preceded its adoption demonstrate that the Park Service attaches great importance to its duties as set forth in the Organic Act. It seeks a balance between preservation and pro-

motion that appears to have been quite successful in the first year of operation under the Interim Management Plan.

■ Defendants correctly note that the Organic Act is silent as to how the protection of park resources and their administration are to be effected. Under such circumstances, the Park Service has broad discretion in determining which avenues best achieve the Organic Act's mandate. *Organized Fishermen of Florida v. Hodel,* 775 F.2d 1544, 1550 (11th Cir.1985); *Sierra Club v. Andrus,* 487 F.Supp. 443, 448 (D.D. C.1980), *aff'd Sierra Club v. Watt,* 659 F.2d 203, (D.C.Cir.1981); *Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Comm.,* 393 U.S. 186, 187, 89 S.Ct. 354, 355, 21 L.Ed.2d 334 (1968). Further, the Park Service is empowered with the authority to determine what uses of park resources are proper and what proportion of the park's resources are available for such use. 16 U.S.C. § 3, *Eiseman v. Andrus,* 433 F.Supp. 1103, 1106 (D.Ariz.1977), *aff'd* 608 F.2d 1250 (9th Cir. 1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980). *See also Udall v. Washington, Virginia, and Maryland Coach Co.,* 398 F.2d 765 (D.C.Cir. 1968), *cert. denied,* 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969).

■ Judge Matsch recently described the Secretary's authority, acting through the Park Service, as "very broad." *Wilkenson v. Department of Interior,* 634 F.Supp. 1265, 1279 (D.Colo.1986). In a challenge to the Secretary's authority to regulate traffic through Rocky Mountain National Park in Colorado, the Eighth Circuit remarked:

> ... [W]e are of the opinion that the power of the government to regulate the traffic on those highways, as it has done by congressional enactment and rules thereby authorized, rests on the secure footing that it is a valid exercise of control over the property of the government, even though it is of the nature of police power, and that it is sustained by section 3, art. 4, of the federal Constitution, which entitles the government to make all needful regulations respecting its ter-

ritory and property. Neither grants of rights of way on the public lands, accepted by user or statute, nor state ownership of highways derived from the government or otherwise effect any abdication of such constitutional authority. Both the power of Congress to grant easements in favor of the public for travel and transportation and its power to legislate concerning territory and property are and must be consistently exercised, and the latter is accomplished by regulations to the end of devoting the adjacent domain owned by the government to the lawful purposes and objects for which a national park is granted. We therefore hold that the regulations here involved cannot be successfully assailed because of interference with private right to use the highways in [the park].

*Robbins v. United States,* 284 F. 39, 45 (8th Cir.1922). These authorities provide ample support for the Park Service's authority to develop the Interim Management Plan.

### III. ADMINISTRATIVE PROCEDURE ACT

■ Since the ESA sets out no standard of review, judicial review of actions by the Park Service are governed by the Administrative Procedure Act (APA), 5 U.S.C. § 500 *et seq.* Under the APA, the scope of judicial review of agency action is a very deferential one, whereby a reviewing court can only set aside agency action which is determined to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law ..." 5 U.S.C. § 706(2)(A). *See, e.g., Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) and *Edwards v. Califano,* 619 F.2d 865 (10th Cir. 1980). Under this standard, a reviewing court must determine whether there is a rational basis which supports the agency's action. *AFL–CIO v. Brennan,* 390 F.Supp. 972, 973–74 (D.D.C.1975). While it is permissible for the court to engage in substantial inquiry into the facts, absent clear error, it must be wary to substitute its judgment for that of an expert agency. *Inde-*

*pendent Meat Packers Ass'n v. Butz,* 526 F.2d 228, 238 (8th Cir.1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976). *See, e.g., New Mexico Environmental Imp. Div. v. Thomas,* 772 F.2d 825, 835 (10th Cir.1986); *American Mining Congress v. Thomas,* 772 F.2d 617, 626 (10th Cir.1985), *cert. denied, United Nuclear Corp. v. Thomas,* — U.S. —, —, 106 S.Ct. 2275 and 106 S.Ct. 2276, 90 L.Ed.2d 718 (1985); *Duke Power Co. v. U.S. Nuclear Regulatory Comm'n,* 770 F.2d 386, 389–90 (4th Cir.1985); *Cagle v. Califano,* 638 F.2d 219, 220 (10th Cir.1981); *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978); and *American Petroleum Institute v. EPA,* 540 F.2d 1023, 1029 (10th Cir.1976), *cert. denied, Exxon Corp. v. EPA,* 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977).

■ The Administrative Record before this Court assails plaintiffs' contentions that defendants' actions in implementing the Interim Management Plan were arbitrary, capricious, or an abuse of discretion. The Court is convinced that the Park Service considered all relevant factors and that its action has a rational basis. *CF & I Steel Corp. v. Economic Development Administration,* 624 F.2d 136, 139 (10th Cir. 1980). *See also Seatrain International v. Federal Maritime Comm'n,* 598 F.2d 289, 292–93 (D.C.Cir.1979).

#### IV. SUMMARY

The Park Service Plan is a commendable one, whose most difficult objective, as this Court sees it, lies in educating the thousands of annual tourists how to decrease and eliminate incidents with grizzly bears through common sense measures such as not leaving food outside. To this Court, it is not the campground that presents the greatest threats to the grizzly bear; rather, it is those people who, for whatever reason, blatantly choose to disregard the National Park Service's rules and regulations.

For the reasons stated above, this Court holds that the Park Service's decision to continue operations of the Fishing Bridge Campground at a reduced level under its Interim Management Plan pending findings from an Environmental Impact Statement is not violative of the Endangered Species Act. The Court further finds that the decision by the Park Service did not violate the National Park Service Organic Act or the Administrative Procedure Act. Having disposed of this matter thus, it is unnecessary to address issues arising under the Concessions Policy Act.

NOW, THEREFORE, IT IS ORDERED that plaintiffs' motion for summary judgment, be, and the same is, hereby denied; it is

FURTHER ORDERED that defendants' motion for summary judgment, be, and the same is, hereby granted.