PACIFIC RIVERS COUNCIL,
et al., Plaintiffs,

v.

F. Dale ROBERTSON, et al., Defendants.

Civ. No. 92–1322–MA.

United States District Court,
D. Oregon.

Oct. 25, 1993.

714

Victor Sher, Todd True, Adam Berger, Sierra Club Legal Defense Fund, Seattle, WA, for plaintiffs.

Thomas Lee, Portland, OR, Fred Disheroon, James C. Kilborne, Elinor Colbourn, U.S. Dept. of Justice, Washington, DC, for defendants.

Mark Rutzick, Preston Thorgrimson Shidler Gates & Ellis, Portland, OR, for defendants-intervenors Northwest Forest Resource Council, et al.

Bruce Smith, Rosholt, Robertson & Tucker, Boise, ID, for defendants-intervenors Intermountain Forest Industry Ass'n.

## AMENDED OPINION

MARSH, District Judge.

On October 21, 1993, the parties filed a joint motion for clarification of my opinion issued on October 6, 1993. The motion is GRANTED and my amended opinion follows.

Plaintiffs filed this action against defendants seeking declaratory and injunctive relief on grounds that the Forest Service (USFS) has violated the Endangered Species Act (ESA) by failing to engage in § 7 consultations with the NMFS on two Land Resource Management Plans (LRMPs)[1] for the Wallowa–Whitman and Umatilla forests re-

---

1. The parties use the terms "LRMPs" and "forest     plans" interchangeably.

garding effects of the LRMPs on threatened Snake River chinook salmon. The forest plans were adopted in 1990, the salmon were listed in 1992. Plaintiffs assert three claims for relief against the USFS: (1) violation of the ESA and APA by failing to consult with NMFS over the Wallowa–Whitman and Umatilla LRMPs; (2) violation of the ESA and APA by failing to ensure that adoption and implementation of the Umatilla and Wallowa–Whitman LRMPs are not likely to jeopardize the species; and (3) violation of ESA § 9 and the APA by "taking" listed species without an incidental take permit.

Plaintiffs now move for partial summary judgment on their first claim seeking an injunction against the continuation of all activity which has been identified by the forest service as activity which "may affect" listed salmon species. Defendants and defendants-intervenors (hereinafter "defendants," except where noted) have filed cross-motions for summary judgment or for dismissal on 5 grounds: (1) plaintiffs lack standing; (2) failure to state a claim; (3) failure to exhaust administrative remedies; (4) the LRMPs are not "agency actions" for which ESA consultation is required; and (5) mootness—that consultations on "anticipated" amendments are underway.

On July 12, 1993, during oral argument on the motions, I directed several questions to the parties regarding: (1) the scope of plaintiffs' requested relief and what activity they *specifically* sought to stay by injunction; (2) what practical effect compliance with the ESA would have on the LRMP beyond ESA compliance on site-specific activities and anticipated "conservation strategies" for listed chinook; (3) the scope, purpose and actual in-practice use of the LRMPs by the Forest Service; and (4) what the Forest Service is actually doing now and under what time-line.

Plaintiffs and defendants submitted supplemental briefs and responses pursuant to my requests and both did an excellent job of providing direct, concise responses to my questions for more background information. In addition, the parties submitted a copy of the entire Wallowa–Whitman LRMP and the biological opinion prepared for the Tucannon River Subbasin which have aided my understanding of the issues.[2]

*Discussion*

a. *Standing*

■ Section 11 of the ESA, 16 U.S.C. § 1540(g), provides that "any person" may maintain an action against another person, or against a government entity, for violations of the ESA.[3] Parties seeking to invoke federal jurisdiction under the ESA must allege the following: (1) an injury in fact; (2) a causal connection between the injury and the challenged action; and (3) that the injury is likely to be redressed by the relief sought. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

Plaintiffs are five non-profit organizations interested in monitoring and protecting public lands, waters and wildlife. Plaintiffs claim that their members "derive recreational, scientific and aesthetic benefit" from the existence of listed Snake River chinook through observation, study and recreational fishing within the Umatilla and Wallowa–Whitman National Forests.[4] Plaintiffs contend that their interests in the listed species have been adversely affected by defendants' failure to consult on the impacts of the LRMPs on the listed species.

■ Defendants have no dispute with plaintiffs' interest in the listed species in the

---

**2.** For further background on the historical development of land and resource planning in the U.S., *see* Charles Wilkinson and Michael Anderson, *Land and Resource Planning in the National Forests,* 64 Or.L.Rev. 1 (1985).

**3.** The ESA defines "person" to include any "individual, corporation, partnership, trust, associa-

tion or any other private entity," or government or municipal entity. § 1532(13).

**4.** Plaintiffs have submitted affidavits from Ric Bailey, Executive Director of plaintiff Hells Canyon Preservation Council, Dan Wadosky, a member of plaintiff Oregon Natural Desert Associa-

Wallowa–Whitman and Umatilla forests,[5] but contend that plaintiffs have failed to allege facts sufficient to show "causation" and "redressability,"—i.e. if the plaintiffs' requested relief is ordered, it will have no impact on the listed species because of the broad programmatic nature of the LRMPs.

■ The heart of defendants' challenge to plaintiffs' standing relates to the underlying merits of plaintiffs' claim. Plaintiffs have countered these arguments by proffering declarations from Jonathan Rhodes, an hydrologist with the Columbia River Inter–Tribal Fish Commission (CRITFC), and Dale McCullough, a fishery scientist with CRITFC. Supported by these declarations, plaintiffs contend that the standards and guidelines in the LRMP are either "too vague" to provide sufficient direction to protect listed chinook habitat, ignore essential aspects of listed salmon habitat, and, where the LRMPs provide specific minimum guidelines (such as to 100 foot riparian "buffer zone"), such guidelines are an inappropriate "floor" to adequately sustain the habitat of the listed species. Further, plaintiffs contend that site-specific consultations would fail to ameliorate potential harm because, in part, such consultations fail to adequately consider long-range future effects and have a relatively narrow geographic focus.

The Ninth Circuit has rejected similar arguments by government defendants regarding the "nexus" required between an alleged procedural violation in the adoption of a management program and harm which could flow from actions authorized under a program. *See Seattle Audubon Society v. Espy,* 998 F.2d 699, 703 (9th Cir.1993) (allegation that interagency strategy failed to consider new information about spotted owl in violation of NEPA and NFMA constituted sufficient "harm" to group's interest in owl to satisfy standing causation requirement); *Portland Audubon,* 998 F.2d at 708 (standing under NEPA established since Timber Management Plans "necessarily drive the location and volume" of decisions which "culminate" in timber sales); *see also Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1515 (9th Cir.1992) (that potential injury may result from chain of events does not doom standing, otherwise programmatic authorization could escape review). Thus, while defendants are technically correct that an LRMP itself should have no direct impact upon listed salmon, actions authorized under an LRMP—such as timber harvesting or grazing—may adversely affect the species.

■ For the limited purpose of establishing standing, I find that the declarations of plaintiffs' members adequately support the existence of an "injury-in-fact," and that the three declarations of Jonathan Rhodes, and portions of the declarations of Dale McCullough adequately allege causation—that the Forest Service's failure to initiate § 7 consultation procedures with respect to the LRMPs may harm listed species, and redressability—that compliance with the ESA may ameliorate such harm.[6]

### b. *The LRMPs*

#### (1) *What is an LRMP?*

Under National Forest Management Act, 16 U.S.C. § 1604 (NFMA), the USFS is di-

---

tion, and Tim Lillebo, a member and staff person for plaintiff Oregon Natural Resources Council.

5. Declarations by organization members who have used and will continue to use forests are generally sufficient to satisfy "injury-in-fact," the first element of standing. *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1581–82 (9th Cir.1993); *see also Portland Audubon Society v. Babbitt,* 998 F.2d 705, 707–08 (9th Cir.1993) (NEPA standing).

6. Government defendants' argument about exhaustion of administrative remedies was premised upon an erroneous assumption that plaintiffs were seeking to compel the Forest Service to revise or amend the LRMPs under the NFMA

regulations, 36 C.F.R. 219.10(f) & (g). In their supplemental memoranda, plaintiffs have unequivocally stated that they do *not* seek amendment of the LRMPs—only consultation under § 7 of the ESA which may or may not ultimately lead to LRMP amendments or revision. Defendants do not contend that the ESA requires exhaustion.

Even if exhaustion was required, however, I find that the letters of September 28, 1992 and December 8, 1992 between John Lowe, the Pacific Northwest Regional Forester, and Rolland Schmitten, Regional Director of the NMFS demonstrate that further administrative relief would have been futile. *See Fraley v. Bureau of Prisons,* 1 F.3d 924, 925 (9th Cir.1993) (exhaustion not required in face of official policy and notice of intent to comply with such policy).

rected to prepare land and resource management plans for individual units of the national forest system which serve as guides to the agency's management for 10–15 years. 16 U.S.C. § 1604(f)(5). A forest plan must provide for multiple use and sustained yield of goods and services from the national forest maximizing long term net public benefits in an environmentally sound manner; meet specified requirements covering a wide-range of forest resources and activities including wildlife; provide adequate fish and wildlife habitat to maintain viable populations of existing native vertebrate species; and "include measures for preventing the destruction or adverse modification of critical habitat for threatened and endangered species." 36 C.F.R. 219.1(a); 219.27(6) & (8); *see also* Wallowa–Whitman LRMP, 2–9. The USFS is directed to select "management indicator species (MIS)," which may or may not be listed species, and thereafter set objectives within the forest plans for maintaining and/or improving MIS habitats. 36 C.F.R. § 219.-19(a) and 219.20. Every resource plan, permit, contract, or any other document pertaining to the use of the forest must be consistent with the Forest Plan. 16 U.S.C. § 1604(i).

The LRMPs at issue in this case are designed to "guide all natural resource management standards and guidelines," for the Umatilla and Wallowa–Whitman National Forests "for the next 10 to 15 years." The Wallowa–Whitman LRMP was approved on April 23, 1990 and the Umatilla LRMP was approved on June 11, 1990—approximately 2 years prior to the listing of the Snake River chinook salmon. The plans include multiple use goals, activity management and maximum forest-wide allowable timber sale quantity—"ASQ."[7] The "Management Goals" section notes social and economic needs and a desire to generally preserve, protect and

enhance "values of the forest's wilderness" and to "double" anadromous fish runs in the Columbia River Basin by the year 2000.

The LRMP section entitled "Forest-wide Standards and Guidelines" covers a broad range of areas including cultural resources, soil quality, recreation, and timber and range management. Anadromous fish and fish habitat are addressed in sections covering watersheds, threatened, endangered and sensitive species and wildlife. The MIS for riparian and aquatic habitats within the Wallowa–Whitman forest only relate to steelhead and resident trout. The watershed section lists 32 standards and guidelines including priority for fish habitat, cooperation and compliance with state agencies and water quality regulations, a 100 foot no timber harvest zone aside class I and II streams,[8] temperature stability goals for class I and II streams, cumulative effects analysis and monitoring, recommendations regarding limitations on heavy equipment use and mining activities near riparian zones, and restricting livestock grazing in municipal watersheds to recreation pack stock. The endangered species section essentially directs compliance with the ESA by requiring biological evaluations for each proposed project as well as cooperation with other state and federal agencies, data collection and monitoring. The wildlife section provides several guidelines for riparian zone management including 60–100% stream shade on live streams, and specific streamside sediment and stability goals.

Defendants do not contend that steelhead or resident trout constitute adequate "indicator" species to protect listed chinook. However, since the adoption of the LRMPs, the Forest Service has considered the listed chinook on a policy-level basis. The "white

---

**7.** Specific ASQ levels are addressed in the accompanying EISs prepared by the USFS. "ASQ" or "allowable sale quantity" is defined as the "upper limit of harvestable wood to be sold from suitable forest land during the first decade of the planning period" and is usually expressed as an annual average ASQ. Timber Sale Program Quantity "TSPQ," is the volume of timber planned for the decade and includes ASQ along with additional material planned for sale. In the

Wallowa–Whitman LRMP, TSPQ is 207 MMBF and ASQ is 141 MMBF.

**8.** The LRMP sets forth four stream classifications in descending priority. Class I streams provide water for domestic use or are used by large numbers of fish for spawning, rearing or migration. *See* Wallowa–Whitman LRMP Glossary, at 45.

718

paper" prepared by Rick Roberts'[9] staff following implementation of the Forest Plan Adjustment Strategy (FPAS), looked at current standards and guidelines for fish, water quality and riparian areas in light of recent ESA listings of Snake River chinook and other listing petitions and recommended "more in depth discussion of federally listed species Recovery Plan objectives in the LRMP's (sic)" with reliance upon "project-level" environmental analysis in the interim. In addition, the USFS entered into an inter-agency cooperative agreement with the NMFS for the express purpose of implementing Forest Plans to be consistent with the ESA. In a directive issued by John Lowe to Forest Supervisors and Directors on September 2, 1992, he notes that, in conducting the FPAS to evaluate the need for changes in the Forest Plan, several studies of forest health and anadromous fish habitat management "which may significantly affect Forest Plan analysis and standards and guidelines are now in progress." This inter-agency agreement contemplates the adoption of "conservation strategies," the preparation of biological opinions and biological evaluations on all projects that "may affect" listed species. Thus, the USFS acknowledges that there may be a need for change or amendment of some kind in the LRMP to further address anadromous fish habitat.

An example of this continuing evaluation is found in the Upper Grande Ronde River Subdrainage Proposed Conservation Strategy ("UGR Strategy"), which is the first and, at this time, only conservation strategy completed for the Wallowa–Whitman forest. Roberts describes this strategy as the "prototype" which is "now going through the decision making process as an amendment to the Wallowa–Whitman LRMP." The need for such a plan is vividly demonstrated in the UGR Strategy. First, it provides a bleak outlook on current anadromous fish habitat conditions (80% deteriorated conditions with only 24 adult spring/summer chinook re-

turning in 1992), and then proposes active floodplain management through canopy closures of 40–75%, streamside shading of 80%, and increasing riparian zone groundcover to 90%.

(2) *The Issues*

The complaint and defenses in this case raise three central and interrelated issues: (1) Is an LRMP an agency action? and (2) If so, is it the *type* of agency action which requires ESA consultation? and (3) If not, is the USFS currently complying with the ESA by consulting on site-specific issues only and by creating an interagency cooperative agreement with NMFS?

Government defendants argue that they have complied with the ESA by adopting a "Forest Plan Adjustment Strategy," (FPAS) and an "inter-Agency Agreement" between the USFS and NMFS. In a nutshell, the Forest Service determined that the best way to address forest management following the salmon listings was to leave the LRMPs as-is and, instead, conduct consultations on a site and activity specific basis.[10] The USFS would do this by organizing the two areas into 11 discrete "watersheds" and by establishing a coordination agreement with NMFS for site-specific activities. John Lowe, the Regional Forester, summarizes the defendants' position in his September 18, 1992 letter to Rolland Schmitten, Regional Director for NMFS:

"the LRMP's (sic) provide program direction to the Forests. The environmental impact statements (EIS) developed for each of the LRMP's addressed the potential effects of implementing programs rather than site specific issues. The nature of a programmatic EIS does not allow for an analysis that would provide a substantive discussion relative to potential effects to a given population of salmon. Projects developed under the direction of the LRMP's require additional NEPA analysis that ad-

9. Rick Roberts is the designated ESA coordinator for the National Forests in Region 6.

10. For example, according to Rick Roberts, the designated ESA coordinator for the National Forests in Region 6, the Wallowa–Whitman National Forest submitted biological evaluations for

11 timber sales between July and November of 1992 to NMFS. On June 9, 1993, NMFS issued a biological opinion that the proposed sales were "not likely to jeopardize the continued existence" of the listed salmon.

dress site-specific effects. The LRMP's (sic) as well as Forest Service direction, require that all projects comply with the ESA and be evaluated with the threatened and endangered species in mind. The Forests are currently consulting with the NMFS on those proposed projects that have the potential to affect listed salmon."

Schmitten agreed with this assessment as set forth in his written response of December 8, 1992: "Informal consultation on these LRMPs would not be constructive or necessary under the ESA at this time." Schmitten notes, however, that, if conservation strategies developed under the Inter–Agency agreement conflict with LRMPs standards or guidelines, the USFS agreed to consider amending the LRMPs.

c.  *Where does the ESA fit in?*

(1) *The Law*

The Endangered Species Act, 16 U.S.C. § 1531, *et seq.*, was enacted by Congress in 1973 to conserve endangered and threatened species. The 1973 Act eliminated the proviso from prior acts that endangered species be protected "where practicable" and directed instead that the "balance [be] struck in favor of affording endangered species the highest of priorities." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180–181, 195, 98 S.Ct. 2279, 2294–2295, 2302, 57 L.Ed.2d 117 (1978); *see also Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir.1987) (noting that ESA significantly restricts court's equity jurisdiction).

Section 7 of the ESA imposes both substantive and procedural requirements upon federal agencies. Section 7(a) requires that agencies "insure that any action authorized, funded or carried out by such agency … is not likely to jeopardize the continued existence of any endangered or threatened species." § 1536(a)(2). This general proscription covers direct threats to species as well as destruction or adverse modifications to "critical" habitat. *Id.* "Agency action" is broadly defined in the regulations to include "all activities or programs of any kind" including:

"(a) actions intended to conserve listed species or their habitat; [or]

\*   \*   \*   \*   \*   \*

"(d) actions directly or indirectly causing modifications to the land, water or air."
50 C.F.R. 402.02.

Sections 7(b) & (c) prescribe a three-step process which includes an initial screening to determine if an endangered species "may be present," and a biological assessment to determine if the present species is "likely to be affected." If the biological assessment determines that an action "may affect" a listed species, the Act requires the action agency to engage in "formal consultation" with the U.S. Fish and Wildlife Service (FWS) or NMFS. Following formal consultation, the FWS or NMFS issues a "biological opinion" evaluating the nature and extent of jeopardy posed to the listed species by the agency action and, if jeopardy is found, suggesting reasonable and prudent alternatives to avoid jeopardy. 15 U.S.C. § 1536(b); *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir.1985). After initiation of consultation under the ESA, section 7(d) requires the maintenance of the status quo by directing that the action agency "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." *See Lane County Audubon*, 958 F.2d at 294 (§ 7(d) designed to maintain status quo pending consultation).

(2) *The Regulations*

■ Regulations promulgated under § 7 of the ESA further refine the 3–step consultation process. As stated above, the action agency makes a biological assessment in the screening process in order to determine if a pending action is likely to affect a listed species that is present. Under the regulations and practices of the USFS, the agency's biological evaluation may result in one of two findings: "no effect" or "may affect."[11] A conclusion of "no effect," if carefully documented, requires no consultation.

11.  Rick Roberts describes the USFS' biological evaluation process in his second declaration, at paragraphs 6 & 7. The "process" is conducted by a USFS biologist who reviews the proposed action and examines any impacts of potential effects on listed species.

If an action is classified as a "may affect," it undergoes a further level of classification: beneficial affect, not likely to adversely affect, or likely to adversely affect. *Id.* As an alternative to a biological assessment, regulation 402.13 would imply that the action agency may undergo informal consultation to determine if the action is likely to adversely affect a listed species. In either event, if the action is found to be one which "may affect" (likely to or not likely to adversely affect) a listed species, the NMFS may "suggest modifications" to the proposed action to further "avoid the likelihood of adverse effects" upon listed species or their habitat. § 402.13. Actions classified either in a biological assessment or informal consultation process as "likely to adversely affect" must undergo formal consultation with NMFS. § 402.14.

According to Rick Roberts, all site specific actions within the LRMPs and in areas in which the species may be present are undergoing formal consultation which will result in the production of either a biological assessment (produced by the USFS) or a biological opinion (produced by NMFS). Roberts also indicates that *during* the consultation process, only those actions classified as "beneficial affect" or "not likely to adversely affect" are permitted to continue because "they have been found not to make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measure which may be generated in the formal consultation process." *See also* Exhibit 9 to the Declaration of John Lowe ("[O]ngoing range allotments that are determined likely to adversely affect will not be allowed to continue in 1993.").

### (3) *Application of the Law and Regulations to LRMPs*

■ There is no dispute that listed chinook species and listed chinook habitat are present in the Wallowa–Whitman and Umatilla forests and, thus, the protection of the ESA, one of the "most comprehensive legislation for the preservation of the endangered species ever enacted" *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978), is applicable to these geographic areas. There is also no question that forest "habitat" management is one of the critical factors of the overall program needed to protect the listed chinook. *See* generally, *Pacific Northwest Generating Cooperative v. Brown,* 822 F.Supp. 1479 (D.Or.1993).

In addition to the general ESA principles discussed, *infra,* the legal analysis in this case centers upon three decisions which provide some spectral parameters: *Lane County Audubon, Swan View,* and *Conner v. Burford.*

In *Lane County Audubon Society v. Jamison,* 958 F.2d 290, 293 (9th Cir.1992), the court addressed the issue of whether the Jamison Strategy was an agency action which required the BLM to consult with the FWS pursuant to ESA § 7 prior to implementation. The Jamison Strategy was a document created in response to the listing of the Northern Spotted Owl which provided 1991 and 1992 timber sale management guidelines within BLM forests in Washington, Oregon and California. The court held that the Jamison Strategy was an "agency action" which required ESA consultation prior or to implementation. I have reviewed the Jamison Strategy and, much like sections within the LRMPs in this case, it merely provided broad, general, programmatic guidance to the BLM regarding where not to harvest timber to protect the Spotted Owl while meeting a program goal of 750 MMBF. The court specifically rejected the BLM's argument that the strategy constituted a mere "policy statement" and found that, in

---

NFRC argued that the USFS "has determined that the plans ... do not affect listed species or critical habitat," citing John Lowe's letter to Rolland Schmitten of September 28, 1992. To the extent NFRC attempts to argue that this satisfied the first stage of an ESA consultation, I disagree for two reasons. First, John Lowe is identified as a regional forester, not a biologist. Second, Lowe claims that the USFS will not consult on the LRMPs because they are programmatic documents not amenable to consultation analysis— not because the USFS has reviewed the LRMP and determined that it would have no effect on the listed species.

implementing the strategy through the adoption of individual sale programs prior to engaging in consultation with the Fish and Wildlife Service, the BLM had violated the ESA even though the BLM *had* consulted with the FWS on individual sales. *Id.*, at 293–94.

Defendants rely primarily upon *Swan View Coalition v. Turner,* 824 F.Supp. 923 (D.Mont.1992) for the propositions that: (1) the "mere continued existence" of an LRMP and the listing of an endangered species subsequent to the adoption of an LRMP does not require ESA consultation or adoption or amendment to an LRMP and; (2) that purely programmatic *portions* of an LRMP may rely upon subsequent site specific consultations. In *Swan View,* plaintiffs claimed that the FWS violated the ESA by failing to prepare an adequate biological opinion addressing the impact of the USFS' adoption of the Flathead Forest Plan (an LRMP) on the threatened grizzly bear and the endangered gray wolf. The plaintiffs' claim was premised upon the fact that specific portions of the Flathead Forest Plan—such as resource production objectives and zoning decisions—failed to include evaluations of impacts on listed species. *Id.,* 824 F.Supp. at 933. The court rejected this argument, finding that the FWS "properly focussed on the standards and guidelines adopted in the Plan which directly relate to the protection of threatened and endangered species." *Id.,* at 933. *See also Village of False Pass v. Clark,* 733 F.2d 605, 607 (9th Cir.1984) (finding biological opinion adequate even though it failed to specifically address drilling and seismic testing limitations to protect gray and right whales).[12] The court further noted that it was particularly "impressed" by the consideration for the grizzly bear included in the Forest plan through the adoption of a set of "inter-agency grizzly bear guidelines." *Id.*

Defendants concede that *Swan View* differs from this case because the FWS had in fact engaged in ESA consultations on the listed species. Defendants argue, however, that the crux of plaintiffs' argument that ASQ or floodplain management guidelines might have differed had the USFS consulted with NMFS essentially mirror the claims rejected by the court in *Swan View.* I find *Swan View* is clearly distinguishable because the challenge was limited to the adequacy of the biological opinion whereas in this case there is nothing to review since the USFS has not determined, either on its own through a biological assessment, or in consultation with the NMFS, whether the LRMPs may affect listed salmon species.[13] The district court specifically found that additional future biological consultations on site specific issues made sense in part, *because* the Forest Plan included an analysis of the "detailed standards and guidelines adopted" for the protection of the listed species, *Id.,* at 933, which are not present in this case.

In *Conner v. Burford,* 848 F.2d 1441 (9th Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989), the USFS requested formal consultations with the FWS regarding impacts of an oil and gas lease program on listed species (grizzly bear, gray wolf, bald eagle and peregrine falcon) in the Flathead National Forest. Both the FWS and USFS agreed that they had insufficient information to render a comprehensive biological opinion on the program, and, instead, decided to engage in consultations and preparation of additional biological opinions at various stages of post-leasing activities. *Id.,* at 1444. Plaintiffs challenged the USFS and FWS on NEPA grounds and on grounds that the sale of leases without a biological opinion assessing the impact of post-leasing activities on endangered species violated the ESA. The district court agreed, setting aside all

---

**12.** Unlike *Conner,* the court in *Village of False Pass,* found the step ESA consultation process acceptable by relying in part, upon the 3–step process prescribed in the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331, for offshore oil drilling. The court approved the step application for ESA consultation in large part *because* the Secretary included prominent disclaimers at each phase (lease, exploration, development & production), retaining discretionary

authority to suspend activity whenever migrating whales were located near the area. *Village,* 733 F.2d at 611.

**13.** Defendants did engage in ESA consultations in connection with the LRMPs for "then-listed" species (1990—the date of adoption) such as the bald eagle.

agency actions allowing the issuance of oil and gas leases and enjoining the government from issuing or recommending any more leases until compliance with the ESA and NEPA. *Id.,* at 1445. On review, the court reversed the district court's conclusion on several of the alleged NEPA violations, but affirmed the district court's ESA conclusions. The court specifically rejected the defendants' proffered "incremental step consultation" as a substitute for a comprehensive biological opinion, noting that species like the grizzly "require large home range making it crucial that ESA review occur early in the process to avoid piecemeal chipping away of habitat." The court expressly rejected any attempt to read into the ESA an authorization for incremental step consultation, noting that § 7(d), which "prohibits the irreversible or irretrievable commitment of resources which might foreclose reasonable and prudent measures, acts to ensure that the status quo be maintained during the consultation process." *Id.,* at 1455, n. 34.

Defendants argue that *Conner* should be distinguished from this case because, unlike a lease, the LRMP is a "broad framework" for management—not a commitment to development—so that additional review at each subsequent stage of development will adequately protect the species. *See e.g. Swan View,* 824 F.Supp. at 936. In addition, defendants point out that, unlike *Conner* and *Swan View,* plaintiffs do not contend that the LRMPs were illegal when adopted in 1990—and that instead, the issue is whether *re-initiation* of ESA consultation is required given the subsequent listing of Snake River chinook.

In their response to plaintiffs' statements of material facts, government defendants argue that the LRMPs are "not agency actions for purposes of the ESA." Yet in their opposition brief and memo in support of their motion for summary judgment, defendants acknowledge that the LRMPs clearly *are* agency actions, but argue that they were "complete" upon their adoption in 1990. They even go so far as to analogize the LRMPs to the "completion of a dam." I find both arguments and the analogy contrary to the descriptions of the LRMPs by Lowe and

Schmitten—the LRMPs are clearly agency actions with ongoing application to current and future activities, and further, defendants acknowledge that the LRMPs are *subject* to modification and review.

Defendants have also argued that the LRMPs have no application to the "jeopardy" determination made by NMFS. I have construed this argument as further support for what is essentially a contention that there is no rational connection between the ESA consultation process and the LRMP. The flaw in this suggestion is that the "jeopardy" determination by NMFS is really just the last step of the ESA process. The first two steps which are taken solely by the USFS—the biological evaluation and the determination of "no effect" or "may affect"—are implemented pursuant to the LRMP. The LRMP's endangered species guideline directs the USFS to comply with the ESA and the USFS' determination of "no effect" or "may affect" are made by reference to LRMP guidelines. For example, in the Tucannon Basin biological assessment for the Dry Creek/Phillips Creek/Gordon Creek/Cabin Creek Watersheds in the Umatilla Forest, two timber sale units, Little Big Hole 21 and 54 were initially classified as "likely to adversely affect" salmon habitat because they would include harvest within 20–50 feet of a perennial stream and their removal would increase stream temperature. Both sales units were modified to provide a 100 foot no-cut buffer zones, consistent with LRMP Watershed Guideline # 6, and thereafter re-classified as an activity "not likely to adversely affect." *See also* Asotin Creek Watershed Assessment (noting similar buffer modification and reclassification).

Aside from the difference in timing, I find little to distinguish the LRMPs in this case from the Jamison Strategy analyzed in *Lane County Audubon*—site-specific projects and activities are implemented pursuant to LRMP standards and guidelines and, thus, under *Lane County Audubon,* constitute agency actions to which the ESA three-step consultation process applies.

In addition, I note that the environmental impact statements to the LRMPs, prepared as required under NEPA, specifically ac-

knowledge that the LRMPs are "major federal actions," which may be "amended or revised to respond to changing needs and opportunities." NEPA consultations are only required for *"major* federal actions" having a significant effect on the human environment, 42 U.S.C. § 4332(2)(C), while the three-step review process under the ESA is triggered for *"any* action" taken by an agency. 16 U.S.C. § 1536(a)(2). *See Conner,* 848 F.2d at 1457–58, n. 40 (strict substantive provisions of the ESA just more stringent enforcement of its procedural requirements compared to NEPA).

Finally, the language of ESA itself suggests that it applies with equal force to actions "authorized," in the past tense under § 7(a)(2), as well as "prospective" agency actions under § 7(a)(3). Had Congress intended that the ESA should apply only to actions authorized or undertaken *after* a pertinent listing decision, it could well have provided such a "prospective" limitation within § 7(a)(2). Had the challenged agency action been the authorization of certain specific timber sales which were completed in 1990, defendants would in all likelihood prevail on mootness grounds. However, I find that the ongoing application of the LRMP to current and future actions makes it a viable candidate for ESA consultation. There is simply nothing in the ESA or its implementing regulations to suggest that the term "agency action" is limited to those programs instituted *following* a listing decision, and further such a temporal restriction would be contrary to the Ninth Circuit's directive that the term be "broadly construed." *Lane County Audubon,* 958 F.2d at 294, *citing Conner,* 848 F.2d at 1452.

Defendants' argument that it would be unduly burdensome to require amendment of the LRMPs each time a resident species is listed misses the mark since this case is not concerned with compliance with the NFMA—i.e. whether there are adequate guidelines in place to ensure the "viability" of existing species—but is strictly limited to procedural and substantive compliance with the ESA. The ESA does not directly require amendment of the LRMP, but merely requires that the USFS start the three step process of biological examination and possible consultation.

■ I am sympathetic to the confusion created when two statutes—in this case the NFMA and the ESA—both require protection of the listed species and understand why defendants would take the position that by consulting on all site-specific and project-specific activities and by studying habitat conditions within watersheds and attempting to create new guideline amendments for the LRMPs to enhance endangered species protection, they would, in effect, be complying with the spirit of the ESA by working to protect listed chinook. However, while one might be able to conclude from the evidence presented that defendants are in compliance with the NFMA, where both the NFMA and ESA apply, both statutes must be followed. *See Seattle Audubon Society v. Evans,* 952 F.2d 297, 302 (9th Cir.1991) (compliance with ESA failed to excuse violations of NFMA's requirement that USFS maintain a "viable" owl population).

■ Based on the foregoing, I find that the Wallowa–Whitman and Umatilla LRMPs are "agency actions," which are being and will be applied to areas in which listed chinook are present since they set forth standards and guidelines for modification of, and multiple-use of resources within listed species habitat. Accordingly, the USFS must apply the ESA three-step consultation procedure to the Wallowa–Whitman and Umatilla LRMPs.[14]

---

**14.** I specifically decline to specify whether consultation between the USFS and NMFS should be formal or informal since the nature of such a consultation will necessarily depend upon the outcome of a USFS biologists' evaluation and a USFS classification—neither of which have taken place yet.

Once the USFS makes such a determination, however, its decision is subject to the arbitrary and capricious standard of review set forth in the APA. *See e.g. Seattle Audubon Society v. Evans,* 771 F.Supp. 1081, 1096 (W.D.Wash.), *aff'd in part* 952 F.2d 297, 298 & 302 (9th Cir.1991). Accordingly, I specifically decline the suggestion of both parties to "predict" either a "no effect" or a "may affect" classification.

#### (4) Injunctive Relief

Plaintiffs have submitted a list of ongoing and proposed projects within the Umatilla and Wallowa–Whitman for which they seek injunctive relief. The lists identify timber, range and road building projects which the USFS has determined "may adversely affect" listed species. Because defendants have halted activities which are likely to adversely affect listed species pending consultation, the bulk of activities identified by plaintiffs are those which the USFS has classified as "not likely to adversely affect." In his third declaration, Rick Roberts reviewed plaintiffs' lists of activities for which they seek injunctive relief and has identified 8 timber projects and 5 road construction projects from the Umatilla forest and 12 timber projects from the Wallowa–Whitman forest which are already complete. In addition, Roberts noted that several "range" projects were closed, vacant or voluntarily not used for 1993.

The Ninth Circuit has held that the traditional sliding scale test for preliminary injunctions, weighing harms against the likelihood of success on the merits, is inapplicable for injunctions sought under the ESA. *Sierra Club v. Marsh,* 816 F.2d 1376 (9th Cir.1987), *citing TVA v. Hill,* 437 U.S. at 173, 98 S.Ct. at 2291. Instead, a plaintiff seeking redress for violations of the ESA is entitled to injunctive relief if the agency "violated a substantive or procedural provision of the ESA," since Congress established both substantive and procedural provisions to assure adequate protection of the listed species. *Id,* at 1384.

Thus, because I have found that defendants violated the ESA by failing to initiate the § 7(a)(2) consultation process, plaintiffs are entitled to injunctive relief. However, because the nature of the challenged activity is far broader than the single construction project enjoined in *Sierra Club* and *TVA v. Hill,* the necessary scope of injunctive relief is more problematic. As noted previously, the Ninth Circuit has suggested that section 7(d) seeks to maintain the "status quo" during the consultation process. *Lane County Audubon,* 958 F.2d at 294. However, the language of § 7(d) actually only prohibits an agency from making "any irreversible or irretrievable commitment of resources ... which has the effect of foreclosing the formulation or implementation of reasonable and prudent alternatives." Thus, certain ongoing activities which may be altered or modified upon completion of consultation, may proceed pending the outcome of consultation. *See e.g. National Wildlife Federation v. National Park Serv.,* 669 F.Supp. 384, 390 (D.Wyo.1987) (continued limited operation of campground pending findings on impact on grizzly bear not an "irreversible commitment" of resources proscribed by § 7(d)). Because the language in the prohibition under § 7(d) does not directly correlate to any of the classifications used by the USFS under § 7(a)(2)—i.e. "may affect," "likely to adversely affect," or "not likely to adversely affect,"—I find that it would be inappropriate to enjoin or to permit any entire USFS classification of activity.

Again, *Lane County Audubon* provides some guidance on this issue. There, the court held that, pending § 7 consultation on the Jamison Strategy, the BLM would be enjoined from conducting any "new" timber sales, finding that the timber sales "are such [§ 7(d)] commitments." 958 F.2d at 293 & 295. However, the court held that sales announced in 1991, but not yet awarded, were "somewhat different," because they had been submitted to the FWS for individual consultations and remanded the issue of injunctive relief as to the 1991 sales to the district court. *Id.,* at 293. In the January 27, 1993 opinion and order of the district court on remand, Judge Jones prohibited the BLM from "announcing or awarding or conducting any additional sales," but excluding 1991 sales already announced "until a later date if necessary."

Applying the principles from *Lane County Audubon* to the facts in this case, the USFS is enjoined from announcing, awarding or conducting any *additional* timber sales, range activities/grazing permits, or road building projects pending compliance with ESA § 7. As for the ongoing or currently proposed projects identified by plaintiffs which have been announced, but which have not yet been completed, I note that the USFS has specifically determined that these

projects not only are not likely to affect listed species, but also that they "have been found not to make any irreversible or irretrievable commitment of resources." [15] The ESA mandates that an agency determination be given deference upon judicial review unless the action is "arbitrary, capricious or otherwise not in accordance with the law." 5 U.S.C. § 706; *Delaney v. E.P.A.,* 898 F.2d 687, 689 (9th Cir.), *cert. denied,* 498 U.S. 998, 111 S.Ct. 556, 112 L.Ed.2d 563 (1990). Plaintiffs have not challenged the USFS' determination that the identified actions do not constitute an irreversible or irretrievable commitment of resources, nor do I have a record before me which would permit judicial review of these determinations. Accordingly, the scope of injunctive relief shall be limited to any proposed future actions within the Wallowa–Whitman and Umatilla forests which fall within the definition of a § 7(d) irreversible or irretrievable commitment of a resource during the consultation period.

## CONCLUSION

Based on the foregoing, I find that the USFS has violated the ESA by failing to comply with § 7 regarding the continued implementation of the Wallowa–Whitman and Umatilla LRMPs and I enjoin any future activities which fall within the scope of § 7(d) pending compliance. Accordingly, plaintiffs' motions for partial summary judgment # 53 and # 78 and motion for injunction # 91 are GRANTED as set forth in this opinion. Government defendants' motion to dismiss # 82 and defendant-intervenors' motions for summary judgment # 62 and # 81 are DENIED.

---

15. *See* the Second Declaration of Rick Roberts, page 8.